**[J-120-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 771 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated |
| | : | November 21, 2018 (docketed |
| | : | November 26, 2018) in the Court of |
| v. | : | Common Pleas, Bucks County, |
| | : | Criminal Division at No. CP-09-CR- |
| | : | 0006917-2005. |
| ROBERT ANTHONY FLOR, | : | |
| | : | SUBMITTED: December 19, 2019 |
| Appellant | : | |


*Justice Mundy delivers the opinion of the Court with respect to Parts I, II, III(G), VI, and VII, in which Chief Justice Baer, Justice Saylor, and Justice Dougherty join; Justice Wecht delivers the opinion of the Court with respect to Parts II and III of his expression, in which Justices Saylor, Todd, and Donohue join. Justice Mundy announces the judgment of the Court with respect to all other issues.*


**<u>OPINION</u>**


**JUSTICE MUNDY**                                    **DECIDED: September 22, 2021**

In this capital case, Appellant, Robert Flor, appeals from the order of the Court of Common Pleas of Bucks County denying his first, timely petition for post-conviction relief filed pursuant to the Post Conviction Relief Act (PCRA).[1]

---

[1] 42 Pa.C.S. §§ 9541-9546. This Court has exclusive jurisdiction over appeals from the denial of PCRA relief in death penalty cases. 42 Pa.C.S. § 9546(d).

## I. Background

On October 23, 2006, Appellant entered a plea of guilty to the first-degree murder of Officer Brian Gregg, of the Newtown Borough Police Department. He further entered pleas *nolo contendere* to various other charges in connection with the events of September 29, 2005.[2]

In preparation for the penalty phase, counsel for Appellant retained and consulted with a number of experts to evaluate, ascertain, and report on potential mitigation factors.[3] Specifically, counsel attempted to prove that Appellant was under the influence of extreme emotional disturbance; Appellant's capacity to conform his conduct to the requirements of law was substantially impaired; and any other evidence of mitigation concerning the character and record of Appellant and the circumstances of the offense, referred to often as the "catch-all" mitigator. *See* 42 Pa.C.S. § 9711(e)(2),(3), and (8). In support of those mitigating factors, Appellant offered evidence to demonstrate he had brain damage, mental impairments, emotional disturbances, impairments caused or exacerbated by alcohol and drug abuse, and a family upbringing marked by abuse and neglect. *See Flor*, 998 A.2d at 626. In addition to a number of Appellant's family members testifying on his behalf, and of particular relevance to his first claim, Appellant offered expert testimony which this Court previously summarized as follows:

---

[2] We have detailed the factual and procedural basis of this case in Appellant's direct appeal in this matter. *See Commonwealth v. Flor*, 998 A.2d 606 (Pa. 2010). Briefly, on the evening of September 29, 2005, Appellant, while in police custody, seized a firearm from a police officer's holster while he was at a hospital undergoing blood alcohol testing relative to suspected driving under the influence. In an attempt to escape, he shot and killed Officer Gregg and shot and wounded an emergency room technician and another police officer.

[3] Attorneys Peter Hall and Bradley Bastedo of the Bucks County Public Defender's Officer represented Appellant.

After the testimony of the family witnesses, the following three mental health experts, who had been retained by Appellant, then testified: (1) Dr. Jonathan Mack, a neuropsychologist and forensic psychologist who, in the weeks prior to the penalty hearing, subjected Appellant to an extensive neuropsychological evaluation to determine if brain damage was present, and the extent and effect of any such damage, N.T., 11/13/06, at 100–05, 109–10; (2) Dr. Pogos Voskanian, a physician certified in psychiatry and forensic psychiatry who conducted a psychiatric evaluation of Appellant involving four personal interviews, beginning in October 2005, as well as interviews of Appellant's mother and grandmother, and review of relevant records and collateral information, N.T., 11/14/06, at 74–75, 81–83; and (3) Dr. Alan Tepper, a psychologist and attorney, who conducted a psychological evaluation of Appellant a few weeks prior to the penalty hearing, and reviewed background materials to assess possible mitigation factors. *Id.* at 158, 163–64.

All three of the mental health experts concluded that Appellant suffered from one or more mental illnesses. Their diagnoses, which were not identical but did overlap, included the following: major depressive disorder, severe without psychotic features; bipolar disorder, manifesting predominantly as depression; dementia; personality change due to brain damage (also known as organic personality syndrome) of the labile, disinhibitive, and aggressive type; post-traumatic stress disorder, related to various childhood traumas; and personality disorder, not otherwise specified. All the experts recognized Appellant's long history of alcohol and drug abuse, and agreed that he exhibited borderline intellectual functions. In addition, the experts found several events to have been significant to Appellant's state of mind at the time of Officer Gregg's murder, *i.e.,* Appellant's loss of the custody of his young daughter, his domestic dispute with the child's mother, his drinking of alcohol, and his arrest. In the opinion of the three defense experts, on the day of Officer Gregg's murder, Appellant was acting under the influence of extreme emotional disturbance and was substantially unable to conform his conduct to the requirements of the law, due to some combination of mental illness, intoxication and long-term substance abuse, and recent stressful experiences. N.T., 11/14/06, at 28–29, 128–29; N.T., 11/16/06, at 39–41. Each expert reached these conclusions from his distinct perspective.

Dr. Mack opined that Appellant had sustained mild to moderate brain damage, caused by a series of head injuries and chronic alcohol abuse. N.T., 11/14/06, at 8–11, 17, 23–24. Dr. Mack further opined that Appellant's brain damage had resulted in the loss of an "internal brake" in his brain, which normally functions to inhibit inappropriate responses or inappropriate behavior due to anticipation of negative consequences. N.T., 11/13/06, at 167–68; N.T., 11/14/06, at 18–19. Dr. Mack explained that alcohol consumption exacerbated Appellant's problems: "You add those two [loss of the internal brake and alcohol consumption] together and you get even worse disinhibition, disinhibition of brain functions, but [Appellant's] brain is bad without alcohol. He's missing his brain, to a large extent, regardless of whether he's on mood altering substance, or sedating substances or not." N.T., 11/13/06, at 167–68. In addition, Dr. Mack opined that it was "very likely [that Appellant was] in major depressive disorder at the time of the incident in question, as triggered by the removal of his daughter by Children and Youth Services, a few weeks prior, and severe fighting, dysfunction with his daughter's mother." N.T., 11/14/06, at 20.

Dr. Voskanian opined that, at the time of Officer Gregg's murder, Appellant was suffering from bipolar disorder and from alcohol and cocaine dependence, and in addition was acutely intoxicated. N.T., 11/14/06, at 83. Dr. Voskanian determined that Appellant's bipolar disorder manifested predominantly as depression, and he suggested multiple causes, including his genetic background, his traumatizing upbringing, his substance abuse, and/or his head injuries. *Id.* at 119–20. Finally, in Dr. Voskanian's view, "the entire rampage at the emergency room, it starts after [Appellant] shot himself in the hand and he could see the emergency room through the hole of the gunshot wound through his hand. That's when he completely loses any volition and control over his behavior." *Id.* at 128.

Dr. Tepper testified regarding Appellant's long history of treatment for drug and alcohol abuse and dependence, beginning in 1992, and then continuing in March 1999, from November 2002 to February 2003, in April 2004, and in February 2005. Finally, on September 20, 2005, just nine days before Officer Gregg's murder, Appellant began drug and alcohol treatment as part of a program to regain custody of his daughter. N.T., 11/16/06, at 16–23. Dr. Tepper also focused on Appellant's poor problem-solving skills.

Specifically, he testified as follows: "[w]ell, [Appellant], when he is sober and somewhat stable, he has real modest ability to solve problems. If he's more upset, angry, impulse [sic], high, drugged, those problem solving abilities are going to be diminished even further." *Id.* at 26–27; *see also id.* at 34 ("under times of stress, under times of difficulty, when feeling angry, when getting mad, getting upset, if he's drinking, if he's high or intoxicated, modest problem solving skills he has, are only going to be diminished further. There's also the underlying brain damage so that influences how he interacts and reacts in general and that is going to be aggravated with, if not stress, specifically when he's under the influence of alcohol or drugs."). With regard to Appellant's emotional functioning, Dr. Tepper opined that Appellant's "cumulative history of developmental interferences [from his childhood] ... really disabled him from later developing a strong kind of sense of himself and ability and confidence." *Id.* at 29. Finally, Dr. Tepper testified that Appellant had difficulty with "impulse control," which rendered him at times unable to control himself. *Id.* at 37–41. On the day of Officer Gregg's murder, Dr. Tepper opined, Appellant was behaving in an "impulsive" way, "meaning that he was making threats, that he was talking about either [sic] hurting individuals. He talked about killing himself. He'd been drinking alcohol." *Id.* at 36.

Thus, as summarized above, the defense experts all concluded that Appellant had difficulty controlling his behavior and his actions. Furthermore, the experts agreed that, on the day of Officer Gregg's murder, Appellant's difficulty with impulse control came to the fore, exacerbated by his consumption of alcohol and recent stressful events in his life.

The Commonwealth did not call its own mental health expert to testify at the penalty proceedings; however, the Commonwealth challenged the defense expert witnesses' testimony with extensive and thorough cross-examination. For example, the Commonwealth clarified that, although Appellant may very well have had some mental health issues, he did not suffer from hallucinations, he was not delusional, and he was not even mildly mentally retarded. N.T., 11/14/06, at 54–56; N.T., 11/16/06, at 65–66. The Commonwealth also emphasized that Appellant's head trauma, postulated by the defense experts as a cause of brain damage, was not supported by any medical record or medical history of head injury. N.T., 11/14/06, at 49–53, 134–35.

*Commonwealth v. Flor*, 998 A.2d 606, 628–30 (Pa. 2010).

Specifically, with respect to the question of intellectual disability, the Commonwealth questioned Dr. Mack resulting in the following exchange: "**Q** [Appellant] is not mentally retarded?; **A** I used the words borderline.  No, he's not mentally retarded.; **Q** [Appellant's] not mildly or mentally retarded?; **A** Correct."  N.T., 11/14/06, at 56.  Similarly, Dr. Tepper testified on cross examination, "[Appellant's] not diagnosed as mentally retarded because of his scores and what's called his adaptive functioning.  . . . He is not, quote, mentally retarded.  . . . Mild mentally retarded is about 65 to 69 and he doesn't fall into that category."  N.T., 11/16/06, at 65.[4]

At the conclusion of the penalty phase, the jury found the following aggravating circumstances: 1) the victim was a peace officer; 2) Appellant committed the murder during the perpetration of a felony; 3) in the commission of the offense, Appellant knowingly created a grave risk of death to another person in addition to the victim; and 4) Appellant had a significant history of violent felony convictions.  *See* 42 Pa.C.S. § 9711(d)(1), (6), (7), and (9).  The jury found no mitigating circumstances.  This Court affirmed Appellant's death sentence on July 22, 2010,[5] and the United States Supreme Court denied his petition for writ of certiorari on April 18, 2011.  *Commonwealth v. Flor*, 998 A.2d 606 (Pa. 2010), cert. denied, *Flor v. Pennsylvania*, 563 U.S. 941 (2011).

---

[4] Previously, the term "mentally retarded" was used to refer to persons whose intellectual functioning rendered them ineligible for the death penalty under *Atkins.*  The United States Supreme Court has since recognized that the preferred term is "intellectual disability."  *See Hall v. Florida*, 572 U.S. 701, 704 (2014) (recognizing the change in terminology under the current edition at the time of the Diagnostic and Statistical Manual of Mental Disorders).  This Court uses the term intellectual disability unless quoting from other sources.  *See Commonwealth v. VanDivner*, 178 A.3d 108, 110 n.1 (Pa. 2018).

[5] We remanded for resentencing on ten counts of recklessly endangering another person.

On May 26, 2011, Appellant filed a timely *pro se* motion for post-conviction relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.[6] On February 25, 2013, the Federal Community Defender's Office filed an amended PCRA petition. The amended petition included the following claims:

> Trial counsel were ineffective during Petitioner's guilty/no contest plea for failing to properly investigate Petitioner's background, Social History and Medical History, failing to consult with necessary experts, failing to properly advise Petitioner during the plea process and allowing Petitioner to enter into a guilty/no contest plea without knowingly, intelligently and voluntarily waiving his right to a trial.

> Trial counsel was ineffective for advising Petitioner to waive his right to a trial without a plea agreement to a life sentence, in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 9 and 13.

> The prosecutor engaged in pervasive misconduct from her opening statement through her closing argument, sparking an inappropriate response from the jurors. Trial and appellate counsel were ineffective for failing to object to the prosecutor's improper conduct or raise this issue on direct appeal.

---

[6] Appellant's *pro se* petition contained the following claims:

> A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

> Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

> A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent.

PCRA Court Opinion, 2/22/19, at 42-43.

Petitioner is ineligible for the death penalty under *Atkins v. Virginia* and its progeny. Trial counsel were ineffective for failing to investigate Petitioner's adaptive deficits and intellectual disabilities, and failing to present evidence that he was ineligible for the death penalty under *Atkins v. Virginia* in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 9 and 13.

Trial counsel was ineffective at Petitioner's penalty phase for failing to investigate Petitioner's background, failing to investigate Petitioner's medical and mental health history and failing to present valuable mitigation evidence; Petitioner's right to effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 9 and 13 was violated.

Petitioner's sentence of death must be vacated because the aggravating circumstances of "grave risk of death to another" is too vague to be constitutionally applied, and was improperly applied here, violating Petitioner's rights under the Sixth and Eighth Amendments. Trial and appellate counsel were ineffective for failing to litigate this claim.

Petitioner's death sentence must be vacated because the sentencing jury was erroneously instructed that defendants who had undergone capital sentencing proceedings in Pennsylvania had received commutations, in violation of the Eighth and Fourteenth Amendments. All prior counsel rendered ineffective assistance of counsel by failing to challenge the improper penalty phase instruction.

Petitioner was denied his right to a public trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 7, 9, and 11 of the Pennsylvania Constitution because the court conducted a full day of trial when the courthouse was closed to the public. All prior counsel were ineffective for failing to object to the courthouse closure.

Petitioner was denied his rights to a fair trial, to a fair and impartial jury and to due process in violation of his rights under the Sixth and Fourteenth Amendments, and Article I, Section 9, because the jury pool from Bucks County was saturated with highly prejudicial pretrial publicity. All prior counsel were ineffective for failing to properly litigate this issue at trial and on direct appeal.

Petitioner was denied his constitutional right to due process and a reliable sentencing hearing because of the cumulative prejudice of the errors set forth in this Petition.

PCRA Court Opinion, 2/22/19, at 43-45.

The PCRA court, per the Honorable Judge Alan M. Rubenstein (who also presided over Appellant's penalty proceedings) heard testimony on the petition over multiple dates between 2016 and 2018.[7] On November 21, 2018, the PCRA court denied the petition, and Appellant appealed to this Court. On February 22, 2019, the PCRA court prepared a 132 page opinion explaining its findings of fact and conclusions of law.[8] Appellant raises the following issues:

1. Is Appellant ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny; were trial counsel ineffective for failing to investigate and present Appellant's intellectual disability, adaptive deficits and Fetal Alcohol Syndrome?

2. Were trial counsel ineffective for failing to investigate Appellant's history and background and failing to present the mitigation evidence a reasonable investigation would have uncovered?

3. Were Appellant's rights to due process, protection from cruel and unusual punishment, a fair trial, and a fair sentencing violated when the prosecutor engaged in misconduct; were trial counsel ineffective for failing to litigate these issues at trial?

---

[7] Specifically, hearings were held on December 2, 2016; December 5, 2016; February 16-17, 2017; September 14-15, 2017; February 8-9, 2018; and May 9-11, 2018. Additionally, this Court resolved a discovery dispute during the pendency of the PCRA proceedings. *See Commonwealth v. Flor*, 136 A.3d 150 (Pa. 2016).

[8] As discussed *infra*, the PCRA court's opinion only addresses Appellant's *Atkins* claims. "Although various issues are raised in Flor's counselled Amended PCRA Petition. . . . his new counsel has asserted that Flor's trial counsel was constitutionally ineffective in failing to pursue the mitigation claim of 'intellectual disability' caused by [fetal alcohol syndrome] at the penalty phase of Flor's capital sentencing." PCRA Court Opinion, 2/22/19, at 1.

4. Were Appellant's constitutional rights violated because the aggravating circumstance "grave risk of death to another" is too vague to be constitutionally applied and was improperly applied here; were trial counsel ineffective for failing to properly litigate this claim?

5. Was Appellant denied a fair trial, a fair and impartial jury, and due process because the jury pool from Bucks County was saturated with prejudicial pretrial publicity; were trial counsel ineffective for failing to properly litigate this issue?

6. Were Appellant's constitutional rights to due process and a reliable sentencing hearing under the Fifth, Sixth, and Fourteenth Amendments and Article I, Sections 9, 13, and 14 violated, because of the cumulative prejudice of the errors set forth in the PCRA Petition?

Appellant's Brief at 1-2.

## II. General Principles of Law

Appellant seeks relief from his sentence of death under the PCRA. To be entitled to PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that the conviction or sentence under review was the result of one or more specifically enumerated bases, the claims have not been previously litigated or waived, and the failure to litigate the issue was not "the result of any rational, strategic or tactical decision by counsel." *See* 42 Pa.C.S. § 9543 (2)-(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue; or it has been raised and decided in a proceeding collaterally attacking the conviction or sentence." 42 Pa.C.S. § 9544(a)(2), (3). "[A]n issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). One basis, relevant to these proceedings, which would afford PCRA relief is "ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have

taken place." 42 Pa.C.S § 9543(2)(ii). When evaluating claims of counsel ineffectiveness, we begin with the presumption that counsel is effective. *Commonwealth v. Spotz*, 18 A.3d 244, 259-60 (Pa. 2011). In order to prevail on an ineffectiveness claim, a PCRA petitioner must comply with the test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117 (Pa. 2012). In this Commonwealth, we have distilled from *Strickland* the following three-pronged test for ineffectiveness, which the PCRA petitioner bears the burden to prove: "(1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error." *Id.* (citing *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987) (parallel citation omitted)).

With respect to our standard of review, we are limited "to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." *Commonwealth v. Mason*, 130 A.3d 601, 618 (Pa. 2015) (citations omitted). We view the evidence of record in a light most favorable to the Commonwealth, as the prevailing party below. *Id.* We are bound by the PCRA court's credibility determinations, unless those determinations are not supported by the record; however, we review the PCRA court's legal conclusions *de novo*. *Id.*

### III.  Issue 1 - *Atkins*

#### A.  Appellant's Argument - Ineffective Assistance of Counsel

In Appellant's first issue, he argues that because he is ineligible to receive the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002), due to his being intellectually disabled, trial counsel was ineffective for failing to investigate and litigate his *Atkins* claim. Appellant's Brief at 11-12. Appellant argues that the evidence presented at the PCRA

hearings demonstrated that trial counsel failed to ascertain certain facts for which there were "red flags" that would have supported an *Atkins* defense rather than merely the mitigation defense the retained experts were tasked with presenting. These "red flags" of which, according to Appellant, trial counsel was or should have been aware, included: Appellant exhibited signs of Fetal Alcohol Syndrome (FAS),[9] Appellant's claim to have obtained a GED was of questionable credibility,[10] and a preliminary assessment arranged for by counsel indicated risk factors for intellectual disability. Specifically, regarding the preliminary assessment, Appellant notes that trial counsel engaged Dr. Dougherty to perform a screening assessment. Dr. Dougherty ultimately recommended counsel arrange for a comprehensive neurological assessment of Appellant, and obtain confirmatory documentation for issues in Appellant's background. Dr. Dougherty's assessment also noted facial features consistent with the effects of FAS. Appellant contends that trial counsel's awareness of Appellant's life history should have indicated that his intellectual deficits preceded his 18th birthday.[11] Appellant contends that, in light of these red flags, it was unreasonable for trial counsel not to conduct a more thorough investigation into the whether Appellant suffered from FAS, and to fail to specifically " ask

---

[9] Appellant explains that FAS "is a Fetal Alcohol Spectrum Disorder (FASD). FASD is an umbrella term used to describe the spectrum of brain damage caused by maternal alcohol consumption during pregnancy. FAS is the most severe diagnosis on the fetal alcohol spectrum." Appellant's Brief at 36.

[10] As ascertained during the PCRA proceedings, Appellant's claim to have obtained his GED was not true.

[11] Attorney Bradley Bastedo testified that he came to the opinion that Appellant was brain damaged based on his observations and dealings with Appellant's family. N.T., 7/25/16 PCRA Hearing, at 20-22, 199-201. However, contrary to Appellant's assertion, he did not opine that such damage existed "since childhood." *Compare id. with* Appellant's Brief at 44.

the experts they did retain to evaluate Appellant for [intellectual disability] or the presence of adaptive deficits." Appellant's Brief at 47.

Appellant proceeds to discuss the factual basis for his *Atkins* claim to establish its arguable merit and prejudice to Appellant incurred by counsels' failure to present it at sentencing. Appellant also faults the PCRA court's factual findings and legal conclusions in its holding that Appellant failed to prove his *Atkins* claim had merit.

## B. Commonwealth's Argument - Ineffective Assistance of Counsel

The Commonwealth recounts the steps trial counsel took to retain experts to evaluate and diagnose Appellant for psychological and intellectual issues. The Commonwealth notes that counsel retained Dr. Dougherty to perform an initial screening and followed through on his recommendation to obtain a "comprehensive evaluation" by retaining Drs. Voskanian, Mack, and Tepper. Dr. Voskanian was tasked with performing a general evaluation so counsel could better ascertain "what [they] had" and to "lead them in the right direction" relative to defenses or mitigation. Commonwealth's Brief at 17 (citing N.T., 12/5/16 PCRA Hearing, at 14, 59). Dr. Mack was tasked with evaluating any presence and extent of brain damage suffered by Appellant. Dr. Tepper was tasked with developing a social history in aid of diagnosis and mitigation. The Commonwealth notes that "[a]t no time did counsel ask their experts to rule in or out certain diagnoses, or otherwise direct the expert witnesses on how to professionally perform their jobs." *Id.* at 18 (citing N.T., 12/5/16 PCRA Hearing, at 144-45). The Commonwealth notes that none of the retained experts related to counsel that they required more background, additional expert evaluations, or further investigation to render the opinions they presented to a reasonable degree of professional certainty. None related that there were "red flags" that required supplementary evaluation. The experts explained that they did not opine about Appellant's potential intellectual disability diagnosis at sentencing because they were not

specifically requested to and were not provided certain information upon which they subsequently relied in rendering their updated opinions in the PCRA proceedings. The Commonwealth argues the PCRA court was correct to reject this explanation. The Commonwealth notes that none of the expert witnesses expressed such limitation in their reports, and Drs. Mack and Tepper in fact testified during the sentencing proceedings that Appellant was not intellectually disabled.

The Commonwealth notes this Court's recent holding that "court[s] may not conflate the roles and professional obligations of experts and lawyers by demanding that counsel spot 'red flags' when the mental health expert failed to do so." *Id.* at 31 (quoting *Commonwealth v. Brown*, 196 A.3d 130, 154 (Pa. 2018)). As such, the Commonwealth argues counsel in this case cannot be deemed ineffective for any uncommunicated self-imposed limitations inherent in an expert's evidence.

### C. Analysis

In the instant case, trial counsel retained a mitigation specialist and consulted three mental health experts who testified in mitigation at Appellant's sentencing. *See* N.T., 12/5/16 PCRA Hearing, at 12-16; *id.* at 83-89. At the time they rendered their respective professional opinions, none of the experts opined or suggested to trial counsel that Appellant had FASD or an intellectual disability. *See, e.g., id.* at 94, 102, 125. Moreover, numerous family witnesses testified to Appellant's upbringing without a suggestion that Appellant had FASD. In the intervening years, some of the experts have changed their respective opinions. Although such shift in opinion may call into question the experts' professional performance, it does not render counsels' performance constitutionally deficient. *See Commonwealth v. Lesko*, 15 A.3d 345, 384 (Pa. 2011) (concluding counsel was not ineffective for retaining a clinical psychologist to offer mitigation evidence rather than a neuropsychologist); *see* N.T., 12/5/16, at 59-60 (Trial Counsel (Attorney Hall)

testifying he retained mental health experts to explore defenses based on Appellant's mental health). In *Lesko*, PCRA counsel retained a neuropsychologist, Dr. Crown, to assess Lesko's mental health. Dr. Crown opined that Lesko suffered from brain damage and that there were numerous "red flags" indicating that diagnosis, which the forensic psychologist retained by trial counsel, Dr. Levit, should have discerned and followed up on. We cautioned that:

> [I]n applying *Strickland,* courts must be careful not to conflate the roles and professional obligations of experts and lawyers. In this regard, it is telling that Dr. Crown's testimony at the PCRA hearing was directed at the examination conducted by Dr. Levit and not the strategy of counsel; thus, Dr. Crown opined that the results of some of the testing conducted by Dr. Levit raised "red flags," which indicated that neuropsychological testing should be conducted. Certainly, these psychological "red flags" could not be directed at counsel, who was unschooled in mental health matters, but were directed at Dr. Levit. In fact, by the neuropsychologist's own testimony, the diagnosis of Borderline Personality Disorder—a diagnosis made by Dr. Levit, not trial counsel— should have raised a question relating to the possibility of brain damage. Again, such opinions, if valid, may call into question Dr. Levit's professional performance, but that is not the same thing as providing a basis to fault trial counsel's legal performance.

*Lesko*, 15 A.3d at 382.

Additionally, in *Commonwealth v. Brown*, 196 A.3d 130 (Pa. 2018), we addressed whether trial counsel was ineffective for failing to arrange further neuropsychological testing to detect brain damage notwithstanding the fact that the expert retained at trial[12] did not advise counsel to any "red flags" pointing to the possibility for brain damage. Similar to the circumstances in the instant case, the expert's opinion in *Brown* of the defendant's brain functioning changed in the years between the imposition of the death

---

[12] The expert in *Brown* was the same Dr. Tepper retained by Appellant in the instant case.

sentence and the defendant's attempts to receive post-conviction relief. We observed, "Dr. Tepper's contention that he would have testified differently if he had access to neuropsychological testing raises issues with his **own** performance, not with the performance of trial counsel. It was his role as the mental health expert, rather than the role of trial counsel, to recognize 'red flags' and recommend further testing." *Brown*, 196 A.3d at 156. We see no basis to depart from that reasoning in the instant case in an *Atkins* context.

The PCRA court found that "there were no limitations placed on the experts as to what they should be seeking or what they should consider during their evaluations." PCRA Court Opinion, 2/22/19, at 111. It further found that counsel reasonably "expected that the experts would advise trial counsel as to [Appellant's] mental health issues and any diagnosis." *Id.* The PCRA Court found that the experts were aware of the import of the *Atkins* case at the time they performed their evaluations and prepared their reports, but none suggested to trial counsel that they needed additional information or testing. *Id.* None suggested further evaluation for FASD. *Id.* at 112. "The experts retained by counsel produced detailed reports and offered their opinions to a reasonable degree of certainty in their respective fields, with two . . . experts specifically testifying that [Appellant] was not intellectually disabled." *Id.* at 112 (citing N.T., 7/25/16 PCRA Hearing, at 106-110).

We conclude these findings are amply supported by the record. We agree that counsel cannot be found to have been ineffective for failing to recognize and respond to the purported "red flags" when the experts retained by counsel were competent and able to advise counsel of any need for further information, or evaluation to address any limitations in their ability to fully evaluate the issues presented by Appellant's mental health, yet failed to do so.

## D. Appellant's Argument - *Atkins* Issue Reviewable on its Merits

Appellant argues that, independent of his ineffective assistance of counsel claim, his substantive *Atkins* claim is cognizable under 42 Pa.C.S. §§ 9542(a)(2)(i) and (a)(2)(vii). Appellant argues that the issue has not been waived or previously litigated, because the evaluations and opinions presented in the PCRA hearing were based on clinical manuals that post-date Appellant's sentencing. Appellant notes that the United States Supreme Court held that a finding of intellectual disability must be based on objective criteria informed by the current prevailing clinical definitions. *Moore v. Texas (Moore-I)*, 137 S. Ct. 1039, 1052-53 (2016). The chief diagnostic authorities expressing prevailing standards are the American Association on Intellectual and Developmental Disabilities (AAIDD), and the American Psychiatric Association (APA). *Id.* The AAIDD and the APA publish diagnostic manuals, which are periodically updated. Appellant notes that "[a]fter Appellant's trial in 2006, five additional clinical manuals have been issued: AAIDD-2007, AAIDD-2010, AAIDD-2012, the DSM-5, and AAIDD-2015, all of which included significant advancements in the diagnosis of [intellectual disability]." Appellant's Brief at 41-42. Appellant argues that even if his ineffective assistance of counsel claim, which focuses on what was or was not presented at the time of sentencing, is rejected, failure to address his substantive *Atkins* claim would preclude the required adjudication under current standards. Specifically, he argues the following:

> Appellant did not waive his *Atkins* claim by failing to present it at trial. For waiver to have occurred, Appellant must have had the opportunity to raise the same claim in a previous proceeding and failed to take advantage of this opportunity. 42 Pa.C.S. § 9544. Appellant's *Atkins* claim relies on five diagnostic manuals issued after 2006; 16 peer-reviewed articles and the 2010 issue of the Journal of Psychoeducational Analysis devoted to the Flynn Effect, all of which were published after 2006, *see* Section I(2), *infra*; and *Moore-I*, *Brumfield*, *Hall*, *Moore v. Texas (Moore-II)*, 139 S. Ct. 666 (2019), *Commonwealth v. VanDivner*, 178 A.3d 108,

130 (Pa. 2018), and *Commonwealth v. Cox*, 204 A.3d 371, 387 (Pa. 2019), . . ..  As none of those authorities were available at the time of Appellant's trial, he could not have raised the same claim at that time.

Appellant's Brief at 42.[13]

### E. Commonwealth's Argument - *Atkins* Issue Reviewable on its Merits

The Commonwealth does not directly argue against Appellant's assertion that his substantive *Atkins* issue is cognizable under the PCRA independently of his ineffective assistance of counsel claim.  Rather the Commonwealth reviews the testimony of the various experts and the PCRA court's credibility findings to argue that Appellant did not meet his burden to prove he is intellectually disabled.

> [Appellant] spends much time "cherry-picking" out phrases from the PCRA court's decision in order to find error with the court's ultimate conclusion that they have not proven by a preponderance of the evidence that Appellant suffers either from FAS or ID.  In fact, the PCRA court's Opinion makes plain that after listening to the competing experts' opinions over nearly five years of litigation, the PCRA court simply found [Appellant's] experts incredible. The court did not consider impermissible factors. It was aware of the relevant law and carefully considered the reports, testimony and conclusions of the many experts who testified. As Dr. Martell admitted, the disparate conclusions the experts reached were really just a matter of "opinion."  N.T. 2/9/18, pp. 34-36. The PCRA court credited the opinion of Dr. [Marcopulos] and considered the opinions of [Appellant's] experts not credible.  These credibility and factual determinations are entitled to "great deference" by this Honorable Court.  *Cox,* 204 A.3d at 389. [Appellant's] bald, conclusory assertions of "facts" to the contrary offer no basis on which to reverse the PCRA court's determinations.

Commonwealth's Brief at 114-115.

---

[13] The Flynn Effect, named for its initial proponent, is a statistical phenomenon, suggested by numerous studies, describing the tendency for the mean scores of an intelligence test to drift upward over time from the initial date for which it was normed, leading to the concern that scores may be inflated over time if a testing instrument is not regularly re-normed.   *See Commonwealth v. Cox,* 204 A.3d 371, 389-92 (Pa. 2019) (*Cox III*).

### F. Analysis - Reviewability

Although not addressed by the PCRA court or the Commonwealth, we question Appellant's assertion that his *Atkins* claim is reviewable under the PCRA. Initially, we remark that the issue as articulated in his amended PCRA petition does not present his *Atkins* issue distinct from his ineffective assistance of counsel claim. As noted by the PCRA court, in his amended PCRA petition, Appellant asserted:

> Petitioner is ineligible for the death penalty under *Atkins v. Virginia* and its progeny. Trial counsel were ineffective for failing to investigate Petitioner's adaptive deficits and intellectual disabilities, and failing to present evidence that he was ineligible for the death penalty under *Atkins v. Virginia* in violation of the Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 9 and 13.

PCRA Court Opinion, 2/22/19, at 44 (quoting Appellant's amended PCRA petition). Nothing in Appellant's issues presented to the PCRA court suggests his claim was based on an entitlement to a review of his *Atkins* claim due to changes in diagnostic criteria in the amended versions of the DSM and AAIDD. Appellant now argues the following changes are pertinent:

> The 2006 findings were not based on *current* diagnostic criteria, but the criteria present at that time. *Moore-I* rejected any attempt to make an *Atkins* determination based on past criteria, and mandated the imposition of *current* diagnostic guidelines in any *Atkins* case. *Moore-I*, 137 S. Ct. at 1049, 1052-53. The distinction is significant. Diagnostic standards have made advances since 2006, including, inter alia: (1) the mandate that IQ scores be corrected for the Flynn Effect during an ID evaluation; (2) the rejection of hard IQ cutoffs, the DSM-5's emphasis on the clinical assessment of intellectual functioning, and the expansion of prong one to include scores above 75; (3) the AAIDD's description of commonly held but erroneous stereotypes; (4) the DSM-5's emphasis on failure to reach age-related expectations as the benchmark of adaptive behavior; (5) the inclusion in the DSM-5 of a clinical description for deficits in each domain of adaptive functioning; (6) the DSM-5's emphasis on clinical judgment in assessing adaptive functioning; (7) the DSM-5's

rejection of the use of group-administered testing in assessing intellectual functioning; and (8) the emphasis on the comprehensive nature of an adaptive behavior assessment by both the AAIDD and the APA. *See* . . . DSM-5 at 34, 37-38.

Appellant's Brief at 82.

Appellant's experts, however, while rendering their opinions in the PCRA hearing based on the current diagnostic standards, did not articulate that their opinions were different than what they would have been under the prevailing criteria extant at the time of sentencing. Further Appellant's conclusion that the changes in the DSM and AAIDD alter the diagnostic landscape is overstated. As the Commonwealth argued relative to the application of the "Flynn Effect," the updated publications do not mandate its application for diagnostic or IQ scoring purposes.[14]

---

[14] The Commonwealth explains,

The current version of the DSM - the DSM-V - mentions the Flynn Effect as a factor "that may affect test scores," but does not suggest adjusting individual scores to account for it. Exhibit D-PCRA-24 (DSM-V: Intellectual Disability, p. 37). The technical manual for the WAIS-III recognizes the Flynn Effect and advises that this phenomenon makes "periodic updating of the norms [ ] essential," but does not instruct to adjust the individually-obtained scores for the Flynn Effect. N.T. 5/22/17 (Vol. I), p. 54; Exhibit D-PCRA-29. Nor does the current version of the Wechsler scale, the WAIS-IV, instruct that the scores obtained from its administration be adjusted. N.T. 5/22/17 (Vol. I), pp. 54-55. [While the FCDO states that the "DSM directs practitioners to Flynn-correct through its requirement that IQ scores be interpreted through clinical judgment," Appellant's Brief, p. 89, this claim is false. There is absolutely no support for the proposition that the DSM's admonition to use clinical judgment in interpreting IQ scores is a direction to practitioners to adjust individual scores for the Flynn Effect, and [Appellant] cites to none.]

Commonwealth's Brief at 36-37 (with footnote in brackets).

These revisions do not purport to redefine intellectual disability, but refine clinical techniques and criteria to aid professionals in recognizing and diagnosing the same. In this case, the PCRA court conducted full evidentiary hearings permitting Appellant to submit evidence that he was intellectually disabled in an effort to prove that trial counsel was ineffective for failing to present evidence and argue he was ineligible for the death penalty in accordance with *Atkins v. Virginia* and its progeny. The PCRA court evaluated the evidence and held Appellant failed to meet his burden to show counsel was ineffective. "There is nothing in the record from 2006 which supports Flor's claim that his counsel was ineffective in not arguing that Flor was intellectually disabled . . .." PCRA Court Opinion, 2/22/19 at 132. We do not view its decision to address Appellant's presentation of evidence as part of the arguable merit and prejudice prongs of a *Strickland* ineffective assistance of counsel claim as a recognition that the merits of the *Atkins* claim was cognizable under the PCRA outside of that context.

Appellant only references Section 9543(a)(2)(i) and (vii) when asserting this claim was not waived and is cognizable in a PCRA action. He does not further explain how these provisions entitle him to relief. As such his claim is underdeveloped. The pertinent provisions are as follows:[15]

> **(a) General rule.--**To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:
>
> . . .
>
> (2) That the conviction or sentence resulted from one or more of the following:
>
> (i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the

---

[15] Appellant does not cite subsection (2)(vi), but we include it for completeness in light of Appellant's claim that his *Atkins* claim is not waived because it could not have been raised earlier applying the current diagnostic criteria.

circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

. . .

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

42 Pa.C.S. § 9543(a)(2)(i), (vi), (vii).

"We . . . construe the PCRA and its eligibility requirements broadly, inasmuch as narrowly confining the PCRA to the enumerated areas of review would undermine the legislative intent that the PCRA is the *sole* means of obtaining collateral relief." *Commonwealth v. Koehler*, 229 A.3d 915, 929 (Pa. 2020) (emphasis in original). Appellant claims, without explanation, that his substantive *Atkins* claim is cognizable under the Subsection (a)(2)(i). The constitutional violation Appellant appears to rely on is the imposition of a death sentence on an individual who is intellectually disabled as prohibited by *Atkins.*

In *Commonwealth v. Miller*, 888 A.2d 624 (Pa. 2005) we held that, procedurally, the vindication of this right is placed on the defendant, who has the burden to raise and prove the issue. Accordingly, a defendant may waive consideration of whether he or she is intellectually disabled explicitly, or by failing to present evidence at sentencing.

> [T]his Court laid out over a series of cases the process by which an intellectual disability challenge may be brought. In so doing, we held in one matter that, analogous to determinations of criminal competency and sanity, a defendant seeking *Atkins* relief bears the burden to prove intellectual disability under the accepted definitions by a preponderance of the evidence. *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 210 nn. 7 & 8 (2003). **It follows that a defendant bears the burden of bringing the *Atkins-***

> **based claim in the first place or may instead elect to
> forego bringing an *Atkins* claim altogether**.

*Commonwealth v. Mason*, 130 A.3d 601, 666 (Pa. 2015) (emphasis added).

Such is the circumstance in this case. Indeed, as previously noted, Appellant's experts at sentencing expressly opined Appellant was not intellectually disabled. Thus Appellant waived his *Atkins* claim. Accordingly, subsection (a)(2)(i) does not entitle Appellant to relief under the PCRA independent of his ineffective assistance of counsel claim.

Nevertheless, Appellant avers his current claim could not have been raised earlier because of changes to the diagnostic criteria since the date of Appellant's sentencing. Implicitly, this assertion relies on subsection (a)(2)(vi). We deem this section inapplicable. The updated manuals are not evidence. They represent diagnostic norms by which evidence is evaluated. See *Moore-II*, 137 S. Ct. at 1052-53. Additionally, the new opinions rendered by Appellant's experts, to the extent they could be considered "new" evidence, do not pertain to Appellant's guilt and are therefore not exculpatory. *See Black's Law Dictionary 8th edition* ("**exculpatory evidence.** Evidence tending to establish a criminal defendant's innocence"). The facts underlying the expert reports and testimony, *i.e.*, the various testing, clinical interviews, and background assessments, were all accessible at the time of Appellant's sentencing.

Moreover, subsection (a)(2)(vii) is also inapplicable. Appellant's sentence of death did not exceed the legal maximum. If, as Appellant argues, the issue was not waived and he was entitled to a hearing and consideration of the merits of his *Atkins* claim because of new diagnostic criteria, then, implicitly, his sentence was proper under the diagnostic criteria prevailing at the time he was sentenced. If this was not the case, the changes in the criteria would be immaterial, and the *Atkins* issue must be deemed waived.

Based on the foregoing, we reject Appellant's assertion that he is entitled to relief pursuant to the merits of his *Atkins* issue independent of his ineffective assistance of counsel claim. Absent a determination of counsel's ineffectiveness, the question of whether the additional evidence presented during the PCRA hearings independently established Appellant's intellectual disability contrary to Appellant's assertion was not before the PCRA court.[16] Resetting of the issue each time an update to diagnostic and testing standards is published, which occurs regularly based upon ongoing research, would belie any finality to capital sentences.[17,18]

---

[16] As noted, the PCRA court made factual findings and credibility determinations of the testimony Appellant presented in support of the arguable merit and prejudice prongs of his ineffective assistance of counsel claim. Based on those findings the PCRA court concluded Appellant had not met his burden.

[17] For example, the American Association of Intellectual and Developmental Disabilities updated 2021 manual refines its definition to include onset by age 22.

[18] Justice Wecht, in Section II(A) of his responsive opinion, disputes our conclusion that Appellant waived his merits based Eighth Amendment challenge as being a non-waivable challenge to the legality of his sentence. Justice Saylor has, in the past, expressed concern over conflating the definition of "legality of sentence" as it occurs in different contexts, *e.g.* the Sentencing Code, cognizablity issues under the PCRA, and this Court's developed waiver jurisprudence, a concern this author shares. *See Commonwealth v. Barnes*, 151 A.3d 121 (Pa. 2016) (Saylor, C.J. concurring). Our caselaw concerning the non-waivability of legality of sentence issues have not been based merely on a "lack of authority", but that the "authority" to impose a sentence was based on a facial application of the statutory provision or constitutional limitation to established or uncontested facts. In the instant case, it is Appellant's failure, in the face of his burden of production and persuasion, to advance, at the time of sentencing, a challenge to the factual underpinnings of his eligibility for the sentence received that determines waiver, which was absent in those cases. *See Commonwealth v. Moore*, 247 A.3d 990, 997 n.12 (Pa. 2021).

That said, as this Court has long noted, the United States Supreme Court in *Atkins* and its progeny, left it to the individual states to implement standards and procedures for implementing its ruling. Despite urging, our legislature has to date not done so. As Justice Eakin expressed in *Miller,* "this is inherently a legislative matter-it is hoped that

## G. Alternative Analysis - Merits

Even if Appellant's *Atkins* claim is deemed to have been reviewable by the PCRA court independently of his ineffective assistance of counsel claim, we conclude that in determining Appellant failed to meet his burden to prove he is intellectually disabled, the PCRA court's factual findings and credibility determinations are supported by the record and its legal conclusions are based on correct legal standards.[19] "In reviewing the grant or denial of PCRA relief, an appellate court considers whether the PCRA court's conclusions are supported by the record and free of legal error. Moreover, the factual findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given deference." *Commonwealth v. Housman*, 226 A.3d 1249, 1260 (Pa. 2020) (internal citations omitted). "A PCRA court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference by reviewing courts. Indeed, one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made . . .." *Commonwealth. v. Johnson*, 966 A.2d 523, 539 (Pa. 2009) (internal citations omitted).

> Our standard of review of the PCRA court's determination regarding whether a petitioner is [intellectually disabled] is a mixed question of law and fact, for which the standard of review is as follows:
>
> A question involving whether a petitioner fits the definition of [intellectual disability] is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom

the legislature would also act without delay." *Miller*, 888 A.2d 624 at 633 (Eakin, J. concurring).

[19] In Pennsylvania, an appellant, as proponent of an *Atkins* claim, bears the burden to prove his intellectual disability by a preponderance of the evidence. *Commonwealth v. Sanchez*, 36 A.3d 24, 63 (Pa. 2011); *see also Mason*, *supra* at 666.

is clearly erroneous. We choose this **highly deferential** standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

*Commonwealth v. Crawley,* 924 A.2d 612, 616 (Pa 2007) (emphasis added). This deference is equally applicable to a court's credibility assessments of expert witnesses. *Commonwealth v. Williams*, 61 A.3d 979, 992 (Pa. 2013). "We will not disturb the findings of the PCRA court if they are supported by the record, even where the record could support a contrary holding. This Court's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." *Commonwealth v. Jones*, 912 A.2d 268, 293 (Pa. 2006) (internal citations omitted).

> An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. Furthermore, a trial judge passing upon [issues dependent of expert opinion testimony] is free to accept one expert witness's opinion over that of a conflicting opinion so long as there is adequate record support.

*Commonwealth v. Banks*, 29 A.3d 1129, 1135 (Pa. 2011).

> Although Atkins determinations are couched in objective clinical terms... the proof is often highly subjective, whether provided by mental health experts or lay persons. Indeed, the fact that mental health experts can draw contrary conclusions from the same set of circumstances, particularly where little pre-conviction record evidence is available, shows the difficulty with such determinations. That difficulty is only exacerbated in a case … where no clinical diagnosis of [intellectual disability] was made prior to age 18, and [the] claim of [intellectual disability] is forwarded strictly in the context of seeking relief under *Atkins*….

*Commonwealth v. Dejesus*, 58 A.3d 62, 85 (Pa. 2012).

As we have explicated, the United States Supreme Court has held that the determination of a defendant's intellectual disability is to be informed by prevailing

medical methods and criteria rather than politically created rules disconnected from general professional consensus.  *Commonwealth v. Cox*, 240 A.3d 509, 517 (Pa. 2020) (*Cox IV*).  That consensus includes definitions provided by the AAIDD and APA, and diagnostic methods outlined in their respective periodically updated publications the AAIDD and DSM as noted earlier.  Those authorities, as this Court has previously described, define three elements to be established for an intellectual disability determination: 1) sub-average intellectual functioning; 2) significant adaptive limitations; and 3) onset before age 18.  *Commonwealth v. Keaton*, 45 A.3d 1050, 1079-80 (Pa. 2012).

Intellectual functioning is determined by professional testing rendering an intelligence quotient (IQ) score, with possible intellectual disability implicated when an individual is approximately two standard deviations from the norm, *i.e.*, 30 points below the mean score of 100.  *Commonwealth v. Hackett*, 99 A.3d 11, 27 (Pa. 2014).  However, a strict cut-off score is not warranted given the role of clinical judgment in the relation of this prong with the others.  *Keaton*, 45 A.3d at 1080.  Rather than a strict numerical measure, testing results represent the probability a subject's IQ is within a range of confidence around the stated score known as a standard error of measurement (SEM), typically a 98% confidence within a ten point range.  *Cox III*, 204 A.3d at 376 n.6.  While particular circumstances may affect clinical judgment in the confidence range of a score, *Moore* has clarified that "other sources of imprecision ... cannot *narrow* the test-specific standard error range."  *Id.* at 388 (citation omitted).

Adaptive limitations are assessed in certain defined sub-categories, with the AAIDD recommending use of standardized testing to determine if a subject has limitations more than two standard deviations below the mean overall or within one of the realms of conceptual, social and practical skills.  *Hackett*, *supra* at. 27.  The DSM directs

assessment of deficits in two subcategories of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health and safety. *Id.* An adaptive behavior is a collection of conceptual, social and practical learned skills that people acquire to function and adapt to the demands of daily life. *Id.* We have held that while the standardized measures for assessing adaptive deficits are preferred, they are not the exclusive means to do so. *Cox IV*, 240 A.3d at 531-32.

Finally, the evidence must demonstrate that any qualifying intellectual functioning and adaptive deficits existed prior to a subject's 18th birthday. The assessment of this prong is self-explanatory and dependent on available information as to the best sources pertinent to the period of time at issue.

As noted, Appellant argues the trial court ignored current diagnostic standards and made findings unsupported by the record. Appellant's Brief at 13. To the contrary, we conclude the PCRA court made exhaustive review of the voluminous testimony and reports from multiple expert witnesses, making credibility findings and assessments based on the legal standards developed by *Atkins* and its progeny. That evidence and the court's findings include the following.

Dr. James Patton, Ed.D., was accepted to testify for Appellant as an expert in the field of Intellectual Disability. He had been retained to evaluate Appellant's adaptive functioning prior to the age of 18. The records Dr. Patton referenced in his report included the 2006 reports of Dr. Allen Tepper, J.D., Psy. D., Dr. Pogos Vosakian, M.D. and Dr. Richard Saul, M.D. Dr. Patton also considered Appellant's school records, treatment center records and employment records. Additionally, in 2012, Dr. Patton administered an Adaptive Behavior Assessment System (2nd Ed.) (ABAS-II), which is designed to have a "declarant" rate a subject's skills and abilities in specific areas relevant to adaptive

development. Dr. Patton chose Appellant's step-sister, Stacey Gilbert (a daughter of one of Appellant's step fathers), as the declarant, instructing her to focus the ratings on when she and Appellant were about 11 years old. Based on Ms. Gilbert's responses, Appellant was rated as impaired for all three domains of adaptive functioning, conceptual, social, and practical. Dr. Patton also testified regarding Appellant's functional academics domain, referencing school records and declarations from school personnel.

The PCRA court discounted the credibility of Dr. Patton's conclusions for a number of reasons. With respect to the ABAS-II, Dr. Patton testified that valid results are dependent on the declarant being "reliable, credible, had regular contact with the individual of reasonably long duration, had an opportunity to observe behaviors associated with the specific skill areas of adaptive functioning, were in close contact with the individual prior to 18 …." PCRA Court Opinion, 2/22/2019, at 55, (quoting Dr. Patton Report pp 7-8). However, Ms. Gilbert's own declaration disclosed she did not live with Appellant during the period she was asked to report on and did not visit most weekends. She did not attend the same school, nor did she necessarily interact with Appellant during the time she did visit. *Id.* (citing N.T. 6/27/2014 at 188). The PCRA court noted that other interviews and records contained contradictory information, which Dr. Patton did not include in his reports. *Id.* at 58-59 (providing examples). Additionally, the court noted that Ms. Gilbert was given a form intended for parents or caregivers. *Id.* at 59 (citing N.T. 6/27/2014 at 56). Furthermore, Dr. Patton testified that the ABAS-II is not designed for retrospective use. *Id.* (citing N.T. 6/27/2014 at 202-203)*.*

Dr. Tepper, who as noted was retained by Appellant as a mitigation expert in 2006, at which time he testified that Appellant was not intellectually disabled, was contacted again in 2013 to review materials for Appellant's PCRA proceedings and offer a new opinion. Dr. Tepper testified that he changed his opinion and now believed Appellant is

intellectually disabled. He based his opinion on a re-review of Dr. Mack's 2006 psychological testing but now taking into account the Flynn Effect to conclude a reduced Full Scale IQ score for Appellant from 76 to 73. Dr. Tepper did not testify that his application of the Flynn Effect in 2015 was based on updates of the APA and AAIDD diagnostic Manuals. Rather, he acknowledged that the principle was known and accepted in 2006, but that he did not apply it then because no adaptive assessment had been done in 2006 to make the difference between a score of 76 and 73 significant. N.T., 7-9-2015 at 147-148. Having now reviewed materials to assess for any adaptive deficits manifesting before the age of 18, including Dr. Patton's report, and declarations of lay witnesses, Dr. Tepper opined Appellant meets the definition for intellectual disability.

The PCRA Court found Dr. Tepper's 2013 report and PCRA testimony unpersuasive. The court noted that, contrary to Dr. Tepper's explanation, he had access to largely the same information in 2006 that he claimed was new in 2013. He did not testify in 2006 when asked if Appellant met the definition for intellectual disability that Appellant had not been evaluated for such or that he had insufficient information from which to draw a conclusion. Rather, he answered that Appellant was not intellectually disabled. In 2006, Dr. Tepper testified that he performed a thorough "tracking" of Appellant from birth to age 18. The PCRA court had independently deemed Dr. Patton's report, which Dr. Tepper cited as newly available information, not to be credible. Neither did the court credit Dr. Tepper's learning that Appellant had not obtained a GED, as he believed in 2006, as a probative factor in supporting his change of opinion. There is no evidence Appellant was unsuccessful in an attempt to pass a GED exam, merely speculation that he was "masking" in an attempt to cover inadequacies, a trait Dr. Tepper acknowledged is not peculiar to individuals with intellectual disability. Additionally, had

Appellant obtained a GED, that fact would not itself preclude the existence of deficits in other domains, which Dr. Tepper had not found or questioned in 2006.

Appellant offered the testimony of Dr. Dougherty, who had been retained by trial counsel to provide an evaluation of Appellant in 2006. At that time, he administered the Kaufman Brief Intelligence Test, 2nd edition, (K-BIT-2), and a Kaufman Short Assessment of Neuropsychological Instrument (K-Snap) to obtain a rough idea of whether intellectual functioning or brain impairment issues were present that would warrant more comprehensive testing. Based on the results, he recommended trial counsel pursue more comprehensive evaluations. In response, trial counsel retained Drs. Mack, Voskanian and Tepper. Dr. Dougherty was contacted by PCRA counsel to offer an opinion of whether Appellant was intellectually disabled. To inform his opinion, Dr. Dougherty reviewed the affidavits from Drs. Mack, Tepper, Voskanian, Patton, and Greenspan, and declarations from lay witnesses, as provided by PCRA counsel. Dr. Dougherty did not conduct any interviews or testing of his own. However, Dr. Dougherty testified that it is important to interview people familiar with the individual subject, and conceded that Stacey Gilbert did not ideally meet that criteria. The PCRA court found Dr. Dougherty's opinion suffered from the same credibility weaknesses it independently noted in the materials and other expert opinions upon which he relied. PCRA Court Opinion, 2/22/19 at 64-65.

Appellant offered the testimony of Dr. Mack, who explained he changed his opinion from 2006 relative to Appellant's intellectual disability based on new information. Dr. Mack reconsidered his prior opinion based on application of the Flynn Effect to his WAISS-III test results from 2006. A second consideration was that Appellant had lied about obtaining a GED at age 19. He testified that in 2006 he viewed Appellant as "capable of passing" a GED but that "[w]hen it became clear that he was not, it put a

different light on the overall understanding of the neurological test results." N.T. 10/18/13, 174. However as noted above, "not obtaining" a GED is not equivalent to "incapable of passing" a GED, and there is nothing in the record establishing the latter. Further, Dr. Mack relied on new reports from the medical and psychological experts and lay declarations to inform his changed opinion. Relative to assessment of adaptive deficits, Dr. Mack considered the report of Dr. Patton and the same lay declarations Dr. Patton reviewed. For example, Dr. Mack considered the declaration from Lester Brassington, who was employed by Pennsbury School District at the time Appellant attended, stating that Appellant was only promoted from grade to grade based on age rather than academic achievement, although he did not personally remember Appellant. The records Mr. Brassington consulted were the same reviewed by Dr. Mack and others in 2006 when no such conclusion was drawn. Another example was a declaration from John and Stacey Butler reporting on Appellant's childhood, although they did not know Appellant during that time. PCRA Court Opinion, 2/22/19 at 70-71. Another important factor in Dr. Mack's new assessment was Dr. Julian Davies' diagnosing Appellant with Fetal Alcohol Syndrome (FAS) (alcohol exposure unconfirmed). Although not in a discipline to enter a diagnosis, Dr. Mack understood the visual signs and indicators for FAS but never suspected FAS in 2006. *Id.* at 72.

Appellant also called Dr. Voskanian to testify about his changed opinion concerning Appellant's intellectual disability. In 2006, Dr. Voskanian conducted an extensive evaluation of Appellant, interviewing him on four occasions, interviewing Appellant's mother and grandmother, and reviewing school and medical records. At that time he opined that Appellant was not intellectually disabled. As with Drs. Tepper and Mack, Dr. Voskanian based his change of opinion on the report of Dr. Patton, the additional declarations from lay individuals, the diagnosis by Dr. Davies that Appellant

suffered from FAS, as well as the revelation that Appellant had not obtained a GED. *Id.* at 72-73.

The PCRA Court noted that Dr. Voskanian had extensive contact with Appellant over a year-long period in 2006, including four interviews, interviews with Appellant's mother and grandmother, and review of school and medical records. Dr. Voskanian was familiar with the visual signs of FAS but, despite his close contact with Appellant in preparation for mitigation at sentencing, Dr. Voskanian never suspected FAS or called for further investigation. After that contact he concluded Appellant was not intellectually disabled. *Id.* at 73.

Appellant offered the testimony of Dr. Julian Davies, M.D., a pediatrician who testified as an expert in the field of Fetal Alcohol Syndrome (FAS). Dr. Davies had been retained to evaluate Appellant for possible FAS. Dr. Davies interviewed Appellant for 90 minutes and reviewed multiple court, medical, employment and educational records. He did not interview Appellant's Mother or review prenatal or childhood records, however. Dr. Davies indicated there are four accepted prongs to a FAS diagnosis: 1) prenatal growth deficiency (weight and/or length); 2) certain minor facial abnormalities (narrow eye slits widths, thin upper lip, smooth philtrum); 3) brain dysfunction or damage; and 4) prenatal alcohol consumption by mother. A specific finding of the fourth prong is not required for a diagnosis if the facial features are present, as they are specific to FAS. Dr. Davies accepted that Appellant's birth weight was five pounds five ounces[20], and that his current stature of five feet four inches was in the third percentile range. Dr. Davies noted Appellant had facial features associated with FAS, including a thin upper lip and a smooth

---

[20] During the testimony, Appellant interjected that he was seven pounds, six ounces at birth, but as noted, Dr. Davies did not review birth records, but consulted a previous memo from a mitigation expert retained at trial, who had interviewed Appellant's Mother.

philtrum.[21]  For the third prong, Dr. Davies did not detect any brain abnormalities from brain scans or tests, and did not perform neuropsychological testing.  He relied on Dr. Mack's testing of Appellant at age 39.  For the final prong, Dr. Davies merely opined that prenatal alcohol consumption would have been consistent with reports Mother drank as a minor even though he reviewed no evidence that mother actually drank during her pregnancy with Appellant.  *Id.* at 74-77.

The PCRA court did not find Dr. Davies diagnosis credible.  No previous expert evaluation suggested FAS, even though the various experts, although not in disciplines qualified to diagnose, were familiar with the diagnostic criteria and in a position to recommend further evaluation and did not do so.  Further, the various alternative explanations were propounded to explain Appellant's behavioral and learning issues, including a chaotic upbringing and abuse.   In addition, Dr. Davies described the process usually employed to evaluate for possible FAS involving a team of specialists which was not employed in this case.  The PCRA court noted "[Appellant] was interviewed by Dr. Davies and given a few tests" based upon which he offered an opinion contrary to the host of experts employed during the mitigation phase of Appellant's trial and sentencing. *Id.* at 81.

Appellant, next offered the testimony of Dr. Natalie Novick-Brown, Ph.D., who had conducted a "life-long functional assessment" of Appellant, concluding there were a number of adaptive deficits based on six "red flags" she noted in a review of records and witness declarations.  These "red flags" included 1) Appellant's Mother's alcohol use surmised from her being "a child of the 60's"; 2) Mother's drug use would correlate with alcohol use; 3) Appellant's low birth weight (determined from the same source used by

---

[21] Based on in-person measurement and software analysis, Dr. Davies opined the smoothness of Appellant's philtrum rated a 4 on a five point lip-philtrum guide with five being the most severe.

Dr. Davies); 4) in connection to possible "executive" dysfunction issues, there were secondhand hearsay reports of two childhood incidents where Appellant reportedly at age two started a kitchen fire, and at some unknown time sawed a head off a hobbyhorse; 5) a statement from Appellant's grandmother that he was a restless active child, which could be an indicator for Attention Deficit Hyperactivity Disorder; and 6) possible learning deficits based on standardized testing and school records.

The PCRA court reviewed the various conclusions drawn by Dr. Novick-Brown about Appellant's supposed adaptive deficits, noting contradictory information contained in the records reviewed and relied upon. The Court also rejected Dr. Novick-Brown's assertion that experts employed by the defense in 2006 were less qualified to detect these "red flags" and see the deficits she had described. *Id.* at 88-89.

Appellant next presented the testimony of Dr. Stephan Greenspan, a developmental psychologist specializing in neurodevelopmental disorders, which includes intellectual disability. Dr. Greenspan was accepted by the court not as an expert to render an opinion concerning Appellant's diagnosis, but to address the methodology and standards employed by the other experts in the case. Dr. Greenspan described the elements of an intellectual disability diagnosis and the criteria and techniques and best practices employed to assess those elements. Dr. Greenspan explained that deficits in adaptive functioning are determined by inabilities or weaknesses not negated by the existence of strengths. An evaluator looks to a subject's typical performance of skills being assessed. Dr. Greenspan testified approvingly of the assessments by Appellant's other experts and critically of the Commonwealth's expert. The PCRA court noted several inconsistencies in Dr. Greenspan's explanation of those best practices and his uncritical acceptance of the opinions of the Appellant's other experts notwithstanding those best

practices were not adhered to, which led it to discount the credibility of his opinion evidence.

For example, Dr. Greenspan opined that in assessing adaptive deficits an evaluator should review as many sources of information as possible to strengthen the results of the ABAS-II ratings. *Id.* at 93-94. Yet he was uncritical of Dr. Patton administering only a single ABAS-II as contrasted with the Commonwealth's expert, Dr. Marcopulos, administering three. *Id.* at 91. Dr. Greenspan also faulted Dr. Marcopulos for accepting the higher ABAS-II scores uncritically, although Dr. Patton was similarly uncritical of Stacey Gilbert's very low scores, with which Dr. Greenspan took no issue. Dr. Greenspan testified that, as an evaluator, he would give less weight to declarations he had not been involved in preparing or from individuals with whom he had not spoken. Nevertheless he did not take issue with Dr. Patton giving weight to declarations Dr. Patton had not been involved in preparing and from individuals to whom he had not spoken.

The PCRA court also questioned Dr. Greenspan's approval of Dr. Patton excluding from his report evidence of Appellant's adaptive strengths under the guise that Intellectual Disability is defined by adaptive deficiencies. While evidence of adaptive strengths cannot be considered to counterbalance evidence of a distinct adaptive deficiency, where evidence is conflicting about a particular adaptive trait, comparison of the respective probity of the evidence and the credibility of the sources must inform a diagnostic opinion. *Id.* at 96. This is evidenced by Appellant's experts testifying that they did not consider exploring intellectual disability as an option at sentencing in part because of their belief Appellant had earned a GED, *i.e.* evidence of an adaptive strength in conceptual skills that outweighed contrary evidence. In finding Dr. Greenspan not credible, the PCRA court explored other inconsistencies in Dr. Greenspan's explanation of best practices, his uncritical review of Appellant's other experts' reports and his critical review of the report

from the Commonwealth's expert, Dr. Marcopulos. *Id.* 96-100. The PCRA court also opined that Dr. Greenspan was motivated by his opposition to the death penalty, noting "[w]hile this did not automatically disqualify his opinion, his testimony barely veiled his bias towards any opinion that failed to comport with his own." *Id.* at 101.

Appellant's final expert witness was Dr. Daniel Martell, a forensic neuropsychologist who was called to critique the report from Dr. Marcopulos. Dr. Martell reviewed documents from the penalty phase through the PCRA proceedings and conducted interviews with some of the earlier declarants that had provided statements.[22] The PCRA court, as with Appellant's earlier expert witnesses, found Dr. Martell lacking in credibility by essentially cherry-picking information to support a predetermined conclusion. *Id.* at 106. For example, Dr. Martell gave little consideration to the ABAS-II tests conducted by Dr. Marcopulos and the single ABAS-II test conducted by Dr. Patton because they lacked a "convergent validity," being at odds in their assessments. Nevertheless, Dr. Martell relied on the various reports from Appellant's other experts which in turn relied on Dr. Patton's report. The shortcomings perceived by the PCRA court were compounded by the mutual reliance by the experts upon one another's reports. *Id.* at 102-103. The PCRA court also questioned Dr. Martell's reliance on Lester Brassington's interpretation of Appellant's school records, where Mr. Brassington did not know Appellant, and was not a counselor at the school while Appellant was there. The court also found Dr. Martell's approach to Appellant's alcohol abuse inconsistent. He opined that intellectual disability may lead to alcohol abuse, but admitted on cross-examination that other facts present in this case, such as Appellant's bi-polar disorder and family history were factors.

---

[22] These included Appellant's step-brother Gary Morgal, Jr, family acquaintances John and Judy Butler, and school counselor Lester Brassington.

Dr. Martell also testified in prior cases that mental health issues, such as depression can affect an IQ score, lowering the result. In this case, the only IQ test was given to Appellant during the pendency of this case. Dr. Martell did not assign any importance to these factors in this case. Rather he endorsed adjustment of the score for the Flynn Effect even though he acknowledged that the Flynn Effect is a "group effect" not typically applied in clinical settings. *Id.* at 105 (citing N.T., 5-8-18, at 184). He suggested it was typical in "high stakes" settings but could cite no studies attesting to the propriety for doing so. *Id.* (citing N.T., 5-8-18, at 185-186).

The PCRA court noted that Dr. Martell was critical of Dr. Marcopulos' consideration of Appellant's standardized test from his school records, opining that achievement tests are not proxies for intelligence measurement. He did not explain why he assumed all the test scores reviewed were achievement tests rather than aptitude tests, which he later conceded would be closer approximations. Nevertheless Dr. Martell agreed with Dr, Marcopulos's statement that standardized tests are not substitutes for IQ tests, but are good evidence when assessing intellectual disability. *Id.*

As noted, the Commonwealth offered Dr. Marcopulos, a clinical neuropsychologist, as an expert in intellectual disability. Dr. Marcopulos reviewed the defense experts' reports prepared for the sentencing as well as those presented in support of Appellant's PCRA. She also conducted her own interviews and review of the records to render an opinion as to whether Appellant was intellectually disabled. Dr. Marcopulos testified that, based on her review, Dr. Mack's testing, report and opinion rendered in 2006 in connection with Appellant's sentencing was sound and she agreed with its assessment. As noted, that testing resulted in a full-scale IQ score of 76, which Dr. Mack at that time opined could have been higher prior to Appellant suffering years of substance abuse and possible concussions. *Id.* at 113 (citing N.T. 12/2/16, at 53-54). Dr. Marcopulos agreed

with Dr. Mack's 2006 findings of Appellant's strengths and weaknesses in cognitive functioning, which she also noted was consistent with Appellant's school records. Dr. Marcopulos testified that Appellant's school records offer the best contemporaneous indicator of his intellectual functioning, given that the only IQ testing did not occur until 2006. Those records, she explained, demonstrate that through the sixth grade Appellant's performance was average and satisfactory. These records include results from standardized testing, and an aptitude test administered in the fifth grade. *Id.* at 114 (citing N.T. 12/2/16 at 81-85). Consistent with the theory advanced by Dr. Mack at the time of Appellant's sentencing, Appellant's performance deteriorated when his step-father died, and he began drinking, using drugs, and missing school. Dr. Marcopulos testified that the Flynn Effect is not generally applied in a clinical setting and she noted its use is mainly raised in capital sentencing cases. Dr. Marcopulos noted that since 2006, revised versions of the DSM and the AAIDD place less emphasis on IQ cut offs and place more emphasis on adaptive deficits, such that variations reflected in the standard deviation or particularized anomalies in testing would render a range of IQ scores compatible with an intellectual disability diagnosis. N.T. 2/16/17 at 107-111. She also noted that prior to Dr. Mack administering the IQ testing, Appellant had undergone competency assessments and was treated for depression which could negatively impact performance, depressing the score. *Id.* at 115.

Concerning the second prong of an intellectually disabled diagnosis, adaptive deficits, Dr. Marcopulos explained that it is important to consult multiple sources from a variety of times and settings. This is true of reliance on ABAS-II testing. *Id.* at 115 (citing N.T. 12/2/16 at 104). As such, Dr. Marcopulos was critical of Dr. Patton's report and his over reliance of the single ABAS-II administered to Stacey Gilbert. Initially, Dr. Marcopulos considered Ms. Gilbert a poor source given her limited contact with Appellant

during the period she was asked to recall. Dr. Marcopulos also deemed her extremely low scores in all areas, equating to "profoundly impaired", were clearly incompatible with all other available information. *Id.* at 116 (citing N.T. 12/2/16 at 111-116).

Dr. Marcopulos administered the ABAS-II to a number of people who knew Appellant at various times and settings in his life. These included Rhonda Bealer, who lived with Appellant for ten years, had a child with him and worked with him in his carpet installation business; Patricia Kairis, who knew Appellant when they were children and reconnected with him as adults, entering into a relationship and having a child together; and Matthew Popovich, a close friend of Appellant when they were children, having greater contact than Ms. Gilbert had during that period.

Mr. Popovich scored Appellant as low-average in the realms of communication, community use, and functional academics and scored a six for the realms of leisure, self-care, and social skills. Ms. Kairis's scores showed Appellant had significant deficits during a time he suffered severe substance abuse problems. Dr. Marcopulos explained that these scores, together with Ms. Kairis's explanation, are consistent with deficits caused by substance abuse, but do not indicate intellectual disability. By contrast, Ms. Bealer's scores were higher than Ms. Kairis's but covered a time Appellant was relatively drug and alcohol free.

Dr. Marcopulos also interviewed Appellant, largely to explore his relationship with the various individuals who provided the statements and information used in the various experts' reports, and to corroborate the information given to minimize reliance on faulty or biased reporting. Dr. Marcopulos noted that the experts who changed their opinions relative to whether Appellant is intellectually disabled did so largely on the basis of Ms. Gilbert's ABAS-II scores, new lay witness declarations, and Dr. Davies' FAS diagnosis. Dr. Marcopulos found these insufficient to support their conclusions. As related above,

Dr. Marcopulos did not find Ms. Gilbert's scoring credible. She considered the lay declarations to be chiefly anecdotal and at variance with interviews she conducted and her observations of Appellant's communications with others.

Pertaining to the FAS diagnosis, Dr. Marcopulos noted the lack of direct evidence confirming that Appellant's mother drank during her pregnancy. She acknowledged that FAS puts an individual at risk for intellectual disability, but is not a substitute for an independent evaluation. FAS is a spectrum disorder exhibiting a variety of symptom combinations such that in an individual case there may be physical features but no cognitive impairment and vice versa. *Id.* at 123 (citing N.T. 12/2/16 at 137-139).

The PCRA court found Dr. Marcopulos to be thorough and compelling and based on independent testing and interviews as well as a review of existing reports and records. *Id.* at 125. The court noted when cross examined on diagnostic criteria and testing protocols from various current manuals and professional sources, Dr. Marcopulos acknowledged them and explained her adherence to them in preparing her report and rendering her opinion. *Id.*

The Commonwealth presented testimony from forensic psychologist, Dr. Leigh Hagan, who had been tasked with evaluating the methods employed by Drs. Mack, Tepper, and Voskanian and whether they comport with accepted scientific and professional standards. Relying on peer-reviewed professional literature, Dr. Hagan opined in his report that Drs. Mack, Tepper, and Voskanian were all professionally well-qualified and their respective 2006 reports and evaluations were thorough and detailed. *Id.* at 126. Dr. Hagan considered their methods employed at that time comported with professional standards and the opinions expressed were supported. However, he pointed out that some of the factors they relied on in changing their opinion did not. *Id.* In particular, he reported that reliance on lay declarations from individuals not interviewed

by the evaluator was not standard.  It is important to assess the basis for knowledge, the credibility of the declarant, corroborating information, the circumstances under which the declaration was given and like factors.  N.T., 5/22/17 at 69.  Dr. Hagan also testified concerning whether it is generally accepted to apply the Flynn Effect to IQ scores.  He testified that adjustment of IQ scores for the Flynn Effect is not generally accepted outside the *Atkins* context, *i.e.* for clinical, qualification for benefits, or educational purposes.  The Flynn Effect is not necessarily a linear phenomenon and may in fact reverse for periods of time.  *See* Def. Ex. 27, AAIDD-2010, at 37.  It is more an indication of uncertainty similar to the SEM considerations that make IQ scores an expression of a range of confidence rather than a hard and fast ranking.  Further the consensus for reducing a score for the Flynn Effect in *Atkins* case contexts is mixed at best, and the advocates for adjustment cite largely to one another rather than independent scientific authority.  PCRA Ct. Op. at 126-127.  Adjustment is not recommended in the manual for the past and current WAIS test.  *Id.* at 54-55.  Further the three point adjustment applied or accepted by Drs. Mack, Tepper, and Voskanian, in Dr. Hagan's view, is arbitrary as the various studies measuring the effect demonstrate "a very wide range of score shifts … including 0.171. 0.25, 0.299, 0.30, and 0.311."  *Id.* at 127 (quoting PCRA-C-30 at page 9).

We find the record supports the PCRA court's conclusion that Appellant did not meet his burden to show he is ineligible for the death penalty due to intellectual disability.  The court was presented with competing expert opinions from Appellant and the Commonwealth and made credibility determinations based on the respective experts' adherence to the professional standards and criteria for which there was general consensus.  The court noted that some of Appellant's experts conducted thorough investigations and evaluations at the time of sentencing and specifically determined Appellant was not intellectually disabled.  The court found that their stated reasons for

changing their opinions were either inadequate or reliant on faulty sources or procedures not compliant with the professional standards espoused by the experts on both sides.

Relative to the first diagnostic prong for intellectual disability, the IQ test conducted by Dr. Mack in 2006 and accompanying report was generally accepted by the experts as comporting with current professional standards. As noted by the PCRA court, that report concluded that Appellant could have scored higher prior to his years of substance abuse and brain injury, which the report did not place at pre-age 18. The chief disputed contention relative to this prong among the experts testifying was whether the score should be adjusted for the Flynn Effect. This Court has not weighed in on the role of the Flynn Effect in interpreting IQ test results, but we have noted "the question of *whether* to consider the Flynn Effect is distinct from *how* the effect should be considered." *Cox III*, 204 A.3d at 389 n.17. Based on the testimony, the general validity of the scoring drifts identified in research of the Flynn Effect is accepted, however the precise measure of the effect and its proper consideration in various diagnostic contexts supports less consensus. The phenomenon is conceded not to necessarily be linear and the measure drift varies in different studies.

We do not find the PCRA court's conclusion that it is not generally accepted practice to adjust an IQ score downward .3 points per year to account for the Flynn Effect erroneous. The WAIS manual does not instruct such an adjustment, although it does advocate updating norms regularly. The AAIDD-11 definition manual does include "recognition of the potential Flynn Effect" in interpretation of IQ scores, but does not direct a specific numerical score adjustment when the test used is the version current at the time. Def. Ex. 27, AAIDD-2010, at 37.[23] Rather we agree that the record here supports

---

[23] Justice Wecht in his dissent concludes this requirement of "recognition" advises downward adjustment of a subject's score. Dissenting Opinion, Wecht, J., slip opinion at 4-5. Respectfully, we deem this reading to include a specific directive not present in the

the PCRA court's conclusion that consideration of the Flynn Effect may be pertinent to interpretation of a score in a particular case, but there is no generally accepted professional requirement or standard for adjusting a specific numerical score. Treated as a consideration, the PCRA court was free to assess the credibility of the respective expert's opinion relative to the impact that consideration had on their opinion of whether Appellant was intellectually disabled. Viewed in this manner the PCRA court did not reflexively reject Appellant's assertion of intellectual disability based on the IQ score alone. Rather, the court recognized such scores portray a range bounded by the tests SEM, and that prevailing professional standards emphasize viewing such scoring as it interacts with adaptive deficits relevant to the second prong. "[W]e do not adopt a cutoff IQ score for determining [intellectual disability] in Pennsylvania, since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish [intellectual disability]." *Miller*, supra at 631. Additionally, as mentioned above, specific circumstances may affect confidence in the range reflected in an IQ score but may not narrow the test-specific SEM. As an example, Dr. Marcopulos opined that the testing circumstances in 2006, including Appellant's treatment for depression and his recent prior competency evaluation may be such circumstances that could suppress results. N.T. 2/16/17 at 115. Therefore the PCRA court had support in the record to reject a mechanical rescoring of Appellant's IQ test result to account for the Flynn Effect in favor of an assessment of the IQ score viewed with a broader range of uncertainty and its interaction with evidence presented pertaining to alleged adaptive deficits. *Cox III*, 204 A.3d at 388.

---

manual's language. What the AAIDD manual urges is that the most recently normed version of a test be used. Adjustment for the Flynn Effect may be warranted only if an older version of a test is used when a more recently normed version is available at the time of testing. *See e.g. Coleman v. State*, 341 S.W.3d 221, n.55 (Tenn. 2011).

The PCRA court's findings and credibility determinations relative to the second diagnostic prong of adaptive limitations were also supported by the record. The PCRA court found that while Appellant's experts stated they rendered their respective opinions based on prevailing professional standards, the methods and sources relied upon were deficient. The PCRA court noted that Appellant's experts to a large degree found support for their opinions in the reports of the other defense experts, often without independent corroboration, in a manner that compounded any error or deficiency inherent in those reports. PCRA Court Opinion, 2/22/19, at 130. The chief example of this was Dr. Patton's report assessing whether Appellant encountered adaptive limitation prior to age 18. The PCRA court credited the Commonwealth experts' critique of the report on the basis of Dr. Patton's reliance on a number of lay declarations without having interviewed the declarants to ascertain their basis of knowledge for the period being reported or potential bias. We have held that in the absence of the preferred standardized testing, adaptive limitations may be assessed according to standards espoused in the AAIDD and DSM through a comprehensive and systematic review of medical, school, employment, and other pertinent records, and "**clinical interviews** with … persons who know the individual well … [i]deally … from those who have the opportunity to observe the person function across community settings and times." *Cox IV*, 240 A.3d at 531-32 (citing *VanDivner*, 178 A.3d at 116 (emphasis added)). On examination, the PCRA court did not discern that the declarants relied on in the report had sufficient contact with Appellant during the time periods for which they were reporting and that the reported observations were inconsistent and unvetted. Interviews that Dr. Martell conducted with Gary Morgal, Jr., the Butlers, and Lester Brassington focused on a time period for which there was no dispute or for which the subjects had insufficient personal knowledge. Additionally the only ABAS-II relied on by Appellant's experts was given to Stacey Gilbert to provide a

retrospective assessment of Appellant's adaptive limitations. The PCRA court noted that the ABAS-II was not designed for retrospective use, that Ms. Gilbert did not have sufficient contact with Appellant during the reported timeframe, and that her extreme responses were completely inconsistent with any other evidence. Nevertheless, Appellant's experts relied on those test results to support their conclusions that Appellant had adaptive deficits before age 18.

As argued by Appellant, the Commonwealth's experts accepted the professional conclusions from Dr. Mack derived from his testing and assessment of Appellant in 2006 at the time of sentencing. Those conclusions included Appellant's reported IQ score of 76, and the fact that he had various adaptive deficits. These findings were at that time attributed to Appellant's long-term drug and alcohol abuse and probable head trauma from an undetermined date or dates. Contrary to Appellant's contention, however, the PCRA court did not discount these findings or the Commonwealth expert's acceptance of them in rejecting the credibility of Appellant's additional sources offered to place the timing of lowered IQ and adaptive deficits to a time before Appellant turned 18. The PCRA court found the additional unvetted lay declarations, Ms Gilbert's ABAS-II responses, and bases of knowledge from those interviewed individuals, were not credible to place in question the original conclusions from Drs. Mack, Tepper, and Voskanian. Thus, given the court's credibility determinations, its determination that Appellant did not prove the second prong for the relevant period is supported by the record and not based on an error of law.

Neither did the PCRA court err in discounting Dr. Davies diagnosis of FAS as a factor justifying the conclusion drawn by Appellant's experts that Appellant was intellectually disabled. The PCRA court questioned the credibility of the reliance on the diagnosis when Appellant's experts involved in his initial evaluations for sentencing

mitigation, although not qualified to diagnose the syndrome, were aware of the symptoms and risk factors but never found them implicated. Further, FAS does not necessarily result in intellectual disability and the mere diagnosis of Appellant as having FAS did not cure the probity and credibility issues with Appellant's remaining evidence as discussed by the PCRA court. For example, while it was testified that FAS is a risk factor for intellectual disability there was no possibility offered for its delayed effect or manifestation, rather that it is a condition from birth. Here the evidence from objective school records and other sources indicated Appellant's performance was average to satisfactory through the sixth grade. Appellant's deteriorating school attendance and performance began in the seventh grade, which coincided with the death of his step-father and attendant family dysfunction. The performance of Appellant's sibling also deteriorated at that time. N.T. 11/13/06 at 76.

Appellant argues the PCRA court erred even if the FAS diagnosis is not accepted because etiology is not a requirement for defining intellectual disability. All that is required is that the first two prongs exist prior to age 18. Whether Appellant's intellectual disability is the result of FAS, or head trauma and drug and alcohol abuse is immaterial. While Appellant is correct that etiology is not a definitional component of intellectual disability, the PCRA court never held that it was. The findings of the PCRA court pertain to whether the additional "red flag" evidence, including Dr. Davies' FAS diagnosis, presented by Appellant supported the changed opinions or newly offered opinions from Appellant's experts that Appellant was intellectually disabled. Additionally, as discussed above, given that Appellant's IQ score encompassed a range of uncertainty, perhaps widened with consideration of the Flynn Effect and testing circumstances, it became pertinent to clinical judgment of the interaction between IQ and adaptive deficits for which etiology may be pertinent. As originally opined by Dr. Mack in 2006, given the then presumed causes of

Appellant's mental issues, his IQ score may have been higher before age 18, whereas with a diagnosis of FAS, this may have been otherwise. Thus etiology is relevant to the extent it informs the existence or extent of the definitional factors. Neither does acceptance by the Commonwealth's experts of Dr. Mack's 2006 testing and assessment establish that those factors existed before Appellant turned 18. While Appellant's drug and alcohol use commenced pre-age 18, there is no evidence the PCRA court deemed credible to establish that Appellant, from whatever cause, suffered a lowered IQ or adaptive deficits prior to age 18.

We disagree with Appellant's argument that the PCRA court relied on disapproved *Briseno* factors[24] or invalid stereotypes in discounting the expert testimony grounded in scientific consensus. The examples of Appellant's abilities cited by the PCRA court were not offered to discount or offset scientific conclusions of Appellant's deficits, but to illustrate that the experts often neglected to consider all sources of information in forming their opinions. The court did not offer examples of adaptive strengths to offset established adaptive deficits, but to illustrate the credibility issues with some of the information relied on by Appellant's experts in determining the existence of a particular deficit in the first place.

We find the record supports the PCRA court's findings that Appellant failed to establish by a preponderance of credible evidence that he is intellectually disabled and therefore ineligible to receive the death penalty. We hold that the PCRA court's determination that the general scientific and professional consensus does not direct that IQ scores be numerically adjusted to account for the Flynn Effect if the most current

---

[24] See *CoxIII*, 204 A.3d at 376-378 (describing this Court's past tacit acceptance of factors deemed relevant to an assessment of whether a subject suffers from adaptive deficits as set forth in *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) and subsequently rejected by the United States Supreme Court).

version of a test available was used is correct, although consideration of the Flynn Effect is appropriate in making clinical judgments upon consideration of the range of the test's SEM and the interaction of the subject's IQ with any adaptive deficits that may exist. Here the PCRA court's finding there was a lack of credible evidence of Appellant's IQ pre-age 18, or the existence of adaptive deficits during that time, is supported by the record. We defer, as we must to the court's credibility determinations, which, contrary to Appellant's contention, were not the result of an abuse of discretion by the PCRA court.

## IV. Issue 2 - Ineffective Assistance of Counsel - Presentation of Mitigating Factors

### A. Appellant's Argument

Next, Appellant contends that he has been subject to ineffective representation of counsel based on a purported failure to investigate and present mitigation evidence to the jury. Appellant's Brief at 101. Appellant notes counsel has a generally recognized duty to thoroughly investigate a defendant's background and any grounds for mitigation. Here, Appellant argues that trial counsel "were aware of red flags" regarding potential prenatal alcohol exposure resulting in FASD as well as intellectual and adaptive deficits and failed to investigate to confirm the diagnosis. *Id.* at 101-102. As developed in his brief, Appellant's argument largely parallels his similar argument relative to his ineffective assistance of counsel claim for failure to recognize the "red flags" and raise an *Atkins* claim. Appellant further contends that trial counsel were ineffective by failing to consult a forensic toxicologist to advise on the validity of the Commonwealth's toxicologist's conclusions.[25]  *Id.* at 101-15.

---

[25] Appellant notes the PCRA court did not address this claim. Appellant's Brief at 114. The Commonwealth acknowledges it was not addressed, but submits it can be decided on the record before this Court. *See* Commonwealth's Brief at 128. Indeed, it is unclear why the PCRA court did not address this and the subsequent issues discussed herein. Appellant avers the PCRA court deemed them waived, but the court did not specifically

## B. Commonwealth's Argument

The Commonwealth counters by detailing the steps counsel undertook to investigate any available mitigation evidence. The Commonwealth points out that, counsel retained an investigator, a mitigation specialist, and three mental health experts, and conducted interviews with Appellant and his close family members. *See* Commonwealth's Brief at 118-19. In the Commonwealth's view, there is no evidence in the record to support the notion that counsel or their experts knew or suspected Appellant of being intellectually disabled, or having sub-average intelligence prior to the age of 18. *See id.* Likewise, with respect to FASD, the Commonwealth reasons that counsel acted reasonably by relying on the three mental health experts retained, none of whom concluded Appellant was ID or recommended further analysis to screen for FASD. *Id.* at 121-122. The Commonwealth disputes the significance of Dr. Novick-Brown's testimony regarding "red flags" for FASD allegedly overlooked by counsel on several grounds. To that end, the Commonwealth posits it would be unreasonable for trial counsel to be ineffective for failing to identify and investigate the "red flags" when the three mental health and medical professionals retained for mitigation did not alert counsel to them. *Id.* at 121-22.

Concerning the claim that trial counsel for Appellant was ineffective for failing to hire a forensic toxicologist, the Commonwealth first points out that it was undisputed that Appellant was intoxicated when he committed the offenses. *Id.* at 128. The Commonwealth further contends that the jury's failure to consider Appellant's intoxication as a mitigating circumstance is not the result of trial counsel's failure to call its own

so state. It may be the PCRA court decided a written opinion was not required on these issues absent any Rule 1925(b) statement being requested of Appellant in this case. Regardless, the remaining issues involve no disputed facts and require only review of whether the PCRA court's rejection of the claims rests on proper legal foundation, which, as we noted above, we review *de novo.*

toxicologist whose testimony would have been cumulative. *Id.* at 128. The Commonwealth also points out that trial counsel testified that he made a strategic decision to make his argument that Appellant's intoxication should serve as mitigation based on information extracted from the Commonwealth's own toxicologist, rather than retain his own witness who would be subject to cross-examination. *Id.* at 129 (citing N.T., 7/25/16, at 202-204).

### C. Analysis

Appellant's claims do not merit relief. Claims regarding trial counsel's stewardship with respect to mitigation evidence require analysis of numerous factors including counsel's reasonableness in investigating evidence, the mitigation evidence presented, and other mitigation evidence that could have been presented. *See Commonwealth v. Ligons*, 971 A.2d 1125, 1149 (Pa. 2009). The same reasoning we discussed above in declining to conflate the roles of experts with the role of counsel applies here. *See Brown*, 196 A.3d at 156.

Likewise, Appellant is not entitled to relief on his claim of ineffective assistance of counsel regarding the decision to not call an independent toxicologist. As the Commonwealth highlights, it was undisputed Appellant was under the influence of alcohol, and the jury was apprised of this fact. *See*, N.T., 11/14/06, at 127 (Dr. Voskanian testifying to the acute circumstances Appellant experienced, including his intoxication and blood alcohol level of .17%). We decline to deem counsel ineffective for not electing to call his own witness to establish an undisputed fact of which the jury was already informed by a number of witnesses. *See Spotz*, 18 A.3d at 311 ("We will not conclude [the appellant's counsel] was ineffective for failing to present additional, cumulative evidence of [the appellant's] drug use and addiction."); *See also Commonwealth v. Baumhammers*, 92 A.3d 708, 725 ("A PCRA petitioner cannot succeed on a claim that counsel was

ineffective for failing to call a witness if the witness's testimony would not have materially aided him"). Appellant's contention that an expert retained by defense counsel would have more effectively presented the effects of the admitted alcohol use and contextualized it more completely with Appellant's other mitigating factors is purely speculative.

## V. Issue 3 - Ineffective Assistance of Counsel - Failing to Object and Litigate Various Instances of Prosecutorial Misconduct

Preliminarily, we note that all of the claims in this section are premised on Appellant's ineffective assistance of counsel claims. When questioned in the PCRA proceedings counsel testified to a lack of recollection to his decision making respecting these issues. As such he could not articulate any strategic reason for failing to object or further litigate the issues beyond speculation. The following discussions are accordingly focused on the arguable merit and prejudice prongs of the *Strickland* inquiry.

### A. Misleading Jury as to its Role

#### 1. Appellant's Argument

In his third issue, Appellant challenges counsel's failure to litigate purported misconduct by the prosecuting attorney in the nature of improper remarks throughout the penalty phase. Appellant's Brief at 115.

Appellant argues that the prosecuting attorney made comments to the jury that misled the jurors about their role and responsibility in sentencing Appellant. *Id.* Appellant argues the following statement by the prosecuting attorney impermissibly relayed to the jurors that responsibility for imposing a death sentence lies elsewhere than with the jury:

> I want to make one thing perfectly clear to you all. Very clear to you all. You do not-do not hold the power of life and death in your hands. You do not. The law decides when that sentence is to be imposed. . . . You cannot and will not come back into this courtroom and decide the issue of life and death.

Appellant's Brief at 116 (quoting N.T., 11/16/06, at 79).

Appellant cites to the United States Supreme Court case of *Caldwell v. Mississippi*, 472 U.S. 320 (1985), which held that the prosecution may not make comments that leave the impression that the decision for imposing a death penalty lies other than with the jury. Appellant notes that this Court has recently deemed a similar comment to be reversible error. Appellant's Reply Brief at 64 (citing *Commonwealth v. Montalvo*, 205 A.3d 274 (Pa. 2019)). Appellant remarks that trial counsel testified that he did not recall his reasons for not objecting to the comment and allowed for the possibility that he may have "flat-out missed" the *Caldwell* objection.

### 2. Commonwealth's Argument

The Commonwealth responds that when reviewing a *Caldwell* claim, a court must view the statements as a whole and claims Appellant has selectively parsed the comment, skewing its meaning and impact. The Commonwealth also claims *Caldwell* is distinguishable as it disapproved comments indicating the responsibility for imposing the death sentence lay with the appellate courts. The Commonwealth notes the full passage was as follows:

> I want to make one thing perfectly clear to you all. Very clear to you all. You do not-do not hold the power of life and death in your hands. You do not. The law decides when that sentence is to be imposed. **The law sets the factors out.** You cannot and will not come back into this courtroom and decide the issue of life and death. **The law has done that years before you entered into this courtroom. What you are asked to do, is find out what the facts are and apply the law faithfully.**

Commonwealth's Brief at 132 (citing N.T., 11/16/06, at 79) (emphasis added). The Commonwealth argues that viewed in full context, the prosecutor was talking about the existence of the death penalty as a potential sanction in the law, not the decision to

impose the penalty in this particular case.  Viewed in context, the import of the comment was to correctly advise the jury its duty was to determine the facts and apply the law.

Furthermore, even if the comment was technically improper, the Commonwealth explains that trial counsel responded directly to the prosecutors comment when addressing the jury.

> [The prosecutor] is a very good district attorney.  She's a great arguer.  But I must say to my old friend, she's not quite accurate on the law.  The decision of life and death is in your hands.  You are the deciders.  You decide the weight to give to the mitigating, and you decide the weight to the aggravating.  If that wasn't your function, then he would automatically get the death penalty for first degree murder of a police officer.

Commonwealth's Brief at 134 (quoting N.T., 11/16/06, at 105).   Lastly, the Commonwealth argues the trial court also instructed the jury that their verdict fixes the sentence.  "Members of the jury, your verdict is not merely a recommendation.  It actually fixes the punishment, death or life imprisonment. Your verdict, whether it is death or life imprisonment, must be unanimous."  *Id.* (quoting N.T., 11/17/06, at 35).

### 3.  Analysis

Appellant is not due relief.  The comment relied on by Appellant when viewed in its full context does not indicate the jury's role is advisory or that it does not have the sole responsibility for determining the sentence in this case.   The prosecutor's comment addressed the fact that the death penalty exists in the law as a potential sentence. The comment did not implicate the jury's duty to apply the sentence in accordance with the facts and the law.  To the extent the comment may have been unartfully ambiguous, the trial court's instruction was clear.

In *Montalvo*, we addressed a *Caldwell* claim where the prosecution referred several times to the jury's role as advisory, including in the following exchange.

DEFENSE COUNSEL:  But again, that is why I chose you folks because I thought you would all try to be fair.  So don't look at him and say I hate that guy, he's got to get the death sentence.  That is not what this is all about.  And [the prosecutor] certainly gave an impassioned plea.  But you don't have to kill anybody.  You don't have to kill anybody.

PROSECUTOR: I object to that argument. They are not doing it.  They are recommending the sentence.

THE COURT: Objection sustained.  That is an improper statement, ladies and gentlemen.  I am the sentencing person.  Your decision is a recommendation to the court.

*Montalvo*, 205 A.3d at 295.  The trial court later gave a correct instruction: "Remember that your verdict is not merely a recommendation. It actually fixes the punishment of life or death, life imprisonment or death." *Id.* at 295.  We held that the later instruction, absent expressly correcting the earlier misstatements of the law did not adequately dispel potential juror confusion and that trial counsel was ineffective for not pursuing the issue on appeal.  In this case the trial court did not give or endorse conflicting directions to the jurors regarding the nature of their role as determiners of sentence.  Viewing the totality of the presentations, we discern no impediment to the jurors' understanding of their task in this case.  *See Commonwealth v. Poplawski*, 130 A.3d 697, 717 (Pa. 2015) ("Juries are presumed to follow instructions").

## B. Exceeding Proper Scope of Victim Impact Evidence

### 1. Appellant's Argument

Appellant alleges that the prosecution engaged in misconduct by permitting inappropriate crime impact testimony and argument.  Appellant's Brief at 116.  Appellant argues that victim impact testimony is constitutionally and statutorily limited to the impact of the death on the decedent's family, and not society or the community at large.  *Id.* (citing *Payne v. Tennessee*, 501 U.S. 808, 823 (1991); *Commonwealth v. Means*, 773 A.2d 143, 158 (Pa. 2001)).  As examples of the prosecution's misconduct in this regard,

Appellant points to the testimony of Officer Gregg's brother, John Gregg, Jr., who testified that his brother's death had an impact on the community; *i.e.* that the community was in "shock and grief," the reaction of the community "has been a source of comfort for our family," describing the presence of the community members at the funeral and funeral procession, and stating his brother was "the kind of man who was an asset to any . . . community." *Id.* (citing N.T., 11/10/06, at 163). Appellant contends the testimony of the police chief was also improper when he testified that Officer Gregg was loved by his colleagues and the communities to which he belonged. Appellant also references similar testimony, from members of the Emergency Room staff and the other shooting victim regarding the shooting's effect as exceeding the proper scope of victim impact evidence. *See id.* at 117-18.

## 2. Commonwealth's Argument

The Commonwealth counters by noting this issue was raised on direct appeal. While this Court held the issue waived for failure to object, we articulated an alternative merits based reason for denying the claim. Relative to the testimony of the decedent's brother, we stated the following:

> Although we deny this claim based on waiver, we must point out that the challenged portion of Mr. Gregg's testimony was merely a few sentences describing how his grieving family was comforted by the knowledge that Officer Gregg had performed his professional duties well and was recognized in the community for his service. The brief statement of Officer Gregg's admirable characteristics was not "improper testimony [that] shifted the focus of the proceeding away from victim impact." Appellant's Brief at 75. Rather, it was testimony that rested well within the parameters explicitly set forth in Section 9711(a)(2).

*Flor*, 998 A.2d at 635–36. Regarding the testimony of decedent's fellow officers, we opined as follows:

Although, as discussed in the text, *supra,* Appellant's challenges to this testimony are waived, we must note that even if the issue were not waived, we would not grant Appellant any relief. The challenged testimony describes Chief Wojciechowski's and Mr. Epp's actions prior to and shortly after the shootings, including their interactions with Officer Gregg and their relationship with him. Included in the testimony are some brief references to Officer Gregg's good qualities as a police officer and a person. We would not conclude that such brief testimony, in the context of a penalty phase hearing of nearly two weeks' duration and involving more than forty witnesses, so inflamed the passions and prejudice of the jury that the verdict should be discarded.

*Id.* at 636 n. 12. Finally, with regard to the testimony of the hospital personnel, we indicted the following:

We also must point out that the testimony of Ms. Fetteroff and Ms. Townsend is not **improper** victim impact testimony—it is not victim impact testimony at all. The challenged testimony concerns neither the victim, nor the impact that the death of the victim has had on his family.

*Id.* at 637 n. 13. The Commonwealth argues this testimony related to the complete circumstances of Appellant's criminal acts, which the jury was entitled to understand in full rather than the killing of Officer Gregg in isolation.[26]

### 3. Analysis

As the Commonwealth argued, this issue was disposed of by this Court, albeit as an alternative analysis to waiver, on direct appeal. Appellant has provided no additional grounds or facts to depart from our prior disposition of the issue. Because the issue was

---

[26] In his reply brief, Appellant argues that the disposition of the issues on direct appeal does not foreclose review under a *Strickland* prejudice claim based on constitutional ineffective assistance of counsel, which is evaluated on a cumulative basis with the totality of Appellant's PCRA claims, including the new mitigation evidence developed during the PCRA hearing. Appellant also disputes the Commonwealth's characterization of some of the testimony as a description of the crimes. "While the Commonwealth can inform the jury of the nature of the crime, the objectionable testimony from Epp, Fetteroff, and Townsend was about the witnesses' injuries separate from the crime. Accordingly, it was improper." Appellant's Reply Brief at 69 (citation omitted).

previously litigated, it cannot provide a basis for relief under the PCRA. *See* Pa.C.S. § 9543(a)(3) (precluding relief if an allegation of error has been previously litigated or waived).

### C. Misinformed Jury as to the Definition and Role of Mitigating Evidence.

#### 1. Appellant's Argument

Appellant argues the prosecutor engaged in cross-examinations of his mitigation expert witnesses about whether, at the time of the homicide, Appellant understood he was shooting the victim and whether he had specific intent. Such questioning, Appellant argues, was irrelevant to the mitigating evidence testified to by Drs. Mack, Tepper, and Voskanian and, together with the prosecutor's later argument only served to imply that mitigation was intended to justify or diminish the severity of the acts. Appellant argues that "[m]itigation can constitute '[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense,' 42 Pa.C.S. § 9711(e)(8), and need not excuse, justify, lessen the severity of or even relate to the offense." Appellant's Brief at 122 (citing *Tennard v. Dretke*, 542 U.S. 274, 287 (2004)).

#### 2. Commonwealth's Argument

The Commonwealth insists that the questions and argument were relevant to different mitigating factors under the statute proffered by Appellant, namely, "[t]he defendant was under the influence of extreme mental or emotional disturbance" and "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa.C.S. § 9711(e)(2), (3). The Commonwealth argues it was entitled to show that Appellant was capable of making decisions concerning his actions in shooting Officer Gregg and in appreciating the criminality of his conduct.

#### 3. Analysis

We agree with the Commonwealth. In his argument, Appellant focuses solely on the "catch-all" mitigation circumstance set forth in Section 9711(e)(8). As we noted in this case on direct appeal, Appellant sought to prove mitigation under Sections (e)(2) and (e)(3) as well. *Flor*, 988 A.2d at 626. Accordingly, the questions and arguments were entirely proper to test Appellant's burden of proving these mitigating factors. We acknowledged as much on direct appeal when we cited Dr. Tepper's testimony as belying any argument that Appellant had met his burden to prove mitigation under Section 9711(e)(3). *See id.* at 627 n. 7.

### D. Misapprehension of Fact

### 1. Appellant's Argument

Appellant notes that the prosecutor at sentencing argued against Appellant's mitigation evidence that he was brain damaged and suffered substance abuse problems and a traumatic upbringing. The prosecutor argued Appellant had not met his burden to prove mitigation on these grounds. However, during the testimony received during the PCRA proceedings, the Commonwealth's expert, whose testimony questioned Appellant's *Atkins* claim, "unequivocally found . . . Appellant was mentally ill and brain damaged." Appellant's Reply Brief at 70. Further the PCRA court credited the expert's evidence. Given these findings from the PCRA proceedings, Appellant insists that it follows that the prosecutor created a misapprehension of fact before the jury at sentencing relative to Appellant's brain damage, substance abuse, and traumatic upbringing.

In responding to the Commonwealth's argument (summarized *infra*), Appellant argues that "this claim is not that trial counsel were ineffective but that the prosecutor's arguments caused Appellant to be sentenced under a material misapprehension of fact

in violation of his constitutional rights." Appellant's Reply Brief at 70 (citing *Parker v. Dugger*, 498 U.S. 308, 322-23 (1991)).

## 2. Commonwealth's Argument

The Commonwealth argues that this assertion by Appellant bears no connection to his ineffective assistance of counsel claim. The evidence Appellant relies on did not exist at sentencing and could not form a basis for claiming prosecutorial misconduct at sentencing or on direct appeal. Further, the Commonwealth maintains that the testimony of its expert relative to the PCRA *Atkins* issue, does not amount to a concession that mitigating circumstances were established at sentencing.

## 3. Analysis

Despite Appellant's assertion in his reply brief, the issue as presented in his PCRA petition clearly alleged ineffective assistance of counsel. *See* PCRA Court Opinion, 2/22/19, at 44 (quoting Appellant's amended PCRA Petition). Appellant offers no explanation as to how this issue is cognizable under a PCRA if not tethered to his ineffective assistance of counsel claim. Furthermore, Appellant's citation to *Parker* is inapt. In that case, the issue involved a reviewing court's misunderstanding of a trial court finding. The reviewing court construed the trial court's finding to be that the defendant had not presented mitigating evidence, whereas the trial court actually found that mitigation evidence was presented but did not outweigh aggravating evidence. Therefore, when the appellate court in that case disapproved two of the aggravating factors as factually unsupported it erred in failing to remand to the trial court for a reweighing of the remaining aggravating factors with the mitigation evidence as required under Florida law. The case did not involve allegations of prosecutorial misconduct. In this case, the import of the evidence Appellant relies on is not conceded by the Commonwealth and did not exist at the time of sentencing to be misconstrued.

### E. Non-Statutory Aggravating Circumstances

### 1. Appellant's Argument

Appellant argues testimony from Ms. Kairis about the circumstances surrounding Appellant's loss of custody of their daughter, her mother's fear of retaliation leading to Children and Youth Services assuming custody, Appellant's threats to kill people made the night before the shooting, and Appellant's past physical abuse toward her was inflammatory and lacked connection to the presence of mitigating or aggravating circumstances. Similarly, Appellant challenges the arresting officer's testimony that he arrested Appellant without waiting for back-up because he feared Appellant could harm his paramour. He argues the evidence amounted to non-statutory aggravating circumstances and should have been excluded.

### 2. Commonwealth's argument

The Commonwealth notes that trial counsel did object at sentencing and direct appeal to the arresting officer's testimony about his fear of harm to the paramour as inflammatory and unduly prejudicial. This Court ruled against Appellant's direct appeal claim, explaining the testimony was probative of the circumstances of the arrest and events leading to the murder of Officer Gregg. *Flor*, 998 A.2d at 640. The custody evidence from Ms. Kairis was also offered by Dr. Mack as part of his assessment of outside stressors affecting Appellant in support of mitigation. Thus, the Commonwealth argues counsel could not object to evidence he was arguing supported Appellant's case for mitigation. Further, the challenged testimony was never offered, nor any argument or instruction made, suggesting the jury should consider the evidence as supporting aggravation.

### 3. Analysis

Appellant's argument is woefully underdeveloped. Appellant lumps together the different statements from different witnesses without any context or discussion. He fails to address the Commonwealth's claim that the issue was addressed on direct appeal. To the extent Appellant includes additional statements other than those raised on direct appeal, he does not explain how they warrant any different treatment. We conclude, when viewed in context, the comments were a proper exposition of the events of the crime. They do not relate ongoing impact on the witnesses, but rather the contemporaneous reactions at the time of the shooting. Such comments gave the jury a complete picture of the events leading up to and during the commission of the shooting and its immediate aftermath. We discern no prejudice to Appellant on the jurors' ability to properly evaluate the evidence of aggravating factors and mitigation as instructed by the PCRA court.

### F. Improper Religious References

### 1. Appellant's Argument

Appellant argues that the prosecution improperly offered testimony from various witnesses that were rife with religious references. Appellant argues:

> [t]he prosecutor presented testimony from Ms. Townsend that she asked people in the emergency room to pray, NT 11/8/06 at 128-129; testimony from Dorothy Criss that after she realized the decedent was dead, she prayed for his soul, *id.* at 221-222; and testimony from ER technician Joseph White, Jr., that he administered last rites to the decedent. NT 11/9/06 at 110.

Appellant's Brief at 124. These statements together with religious references made by the prosecutor, *i.e.*, use of the word "hell" and the phrase "grace of god," in her closing argument constituted an impermissible reliance upon religion to support a death sentence. *Id.* (citing *Commonwealth v. Chambers*, 599 A.2d 630, 644 (Pa. 1991)).

### 2. Commonwealth's Argument

The Commonwealth argues that the "religious" phrases identified by Appellant used by the witnesses and prosecutor were instances of everyday use of such language, not an improper invocation of religious authority. The Commonwealth argues that Appellant's reliance on *Chambers* is unavailing. The prosecutor in Chambers quoted from the Bible saying, "and the murderer shall be put to death." *Chambers*, 599 A.2d at 643. In determining that statement improper, this Court emphasized it was the invocation of religious authority as an "independent source of law" that was *per se* prejudicial. *Id.* at 644. The statements referenced by Appellant did not invoke any religious authority as an independent source of law or justification for imposing a death sentence.

### 3. Analysis

Appellant's argument is again cursory and undeveloped. He cites to purportedly religious references from witnesses and the prosecutor without providing any context and baldly asserts they improperly influenced the jury. Appellant does not suggest that the phrases from the witnesses were deliberately elicited by the prosecutor so as to be a basis for the alleged prosecutorial misconduct. Clearly, the cited statements occur in common parlance and Appellant refers to no authority requiring that such phrasing is improper or should be excised from relevant testimony. The Commonwealth's use of the cited phrases in her closing constituted oratorical flair, not an invocation of religious authority of concern in *Chambers*. As we explained:

> More than allegorical reference, this argument by the prosecutor advocates to the jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for Appellant. By arguing that the Bible dogmatically commands that "the murderer shall be put to death," the prosecutor interjected religious law as an additional factor for the jury's consideration which neither flows from the evidence or any legitimate inference to be drawn therefrom. We believe that such an argument is a deliberate attempt to destroy the objectivity and impartiality of the jury which cannot be cured and which we will not

countenance. Our courts are not ecclesiastical courts and, therefore, there is no reason to refer to religious rules or commandments to support the imposition of a death penalty.

*Id.* Accordingly, Appellant's claim lacks arguable merit.

## VI. Issue 4 - Aggravating Circumstance Unconstitutionally Vague; Ineffective Assistance of Counsel

### A. Appellant's Argument

Appellant argues the term "grave risk" as used in the aggravating factor set forth in 42 Pa.C.S. § 9711(d)(7) is unconstitutionally vague and was unconstitutionally applied in this case.[27] Appellant contends the term "grave risk" is susceptible to an overly broad interpretation, and fails to provide any guidance to the jury. Appellant's Brief at 127 (citing *Gregg v. Georgia*, 428 U.S. 153 (1976)). To counter such susceptibility, a narrowing instruction by the trial court or a narrow construction by a state's appellate courts is required. *Id.* (citing *Maynard v. Cartwright*, 486 U.S. 356, 360 (1988)). Appellant contends neither method, to overcome the unconstitutional vagueness occurred, here. Specifically, Appellant claims the trial court's instruction did not clarify the meaning or parameters of the "knowingly" or "close proximity" elements. Further the trial court did not instruct the jury that they must "be unanimous about whom it found to be knowingly placed at grave risk of death." *Id.* at 128. Appellant acknowledges that this court has rejected identical claims in other cases. *Id.* (citing *Commonwealth v. Smith*, 540 A.2d 246, 261 (Pa. 1988)).

### B. Commonwealth's Argument

---

[27] The text of the statute provides that "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S.A. § 9711(d)(7).

The Commonwealth echoes the point that this Court has previously held that Section (d)(7) is not unconstitutionally vague. Further, the Commonwealth notes the facts of this case, where Appellant fired several gunshots inside an emergency room with many people present, indeed wounding one unintended victim, readily supports the jury's finding. The Commonwealth further argues the trial court's instruction was proper and identified the people in the zone of danger.[28]

The Commonwealth avers Appellant provides no authority for his claim that the jurors must identify specific individuals they found to be at risk.

### C. Analysis

As acknowledged by Appellant, this Court has rejected identical void for vagueness claims relative to Section 9711(d). *See Smith*, 540 A.2d at 261 (holding, "The jury is quite capable of understanding the meaning of 'grave risk' and of applying its common sense and experience to the facts to determine whether a grave risk had indeed been created). We reaffirmed this holding in *Commonwealth v. Wright*, 961 A.2d 119, 157 (Pa 2008), wherein we held:

> Appellant further argues counsel were ineffective for failing to object to the trial court's charge regarding the "grave risk of

---

[28] The court instructed as follows:

> The third aggravating circumstance, in the commission of this offense, the defendant, Robert Flor, knowingly created a grave risk of death to another person, in addition to the victim of the offense, Officer Brian Gregg. Again, it's for you to recall, as I understand the Commonwealth and their allegation, and they have alleged that committing this First Degree Murder, the defendant created a grave risk of death to Officer James Warunek and to Joseph Epp, as well as to other persons, who were in the emergency room at St. Mary's Hospital at the time of the shooting.

N.T., 11/17/06, at 27-28.

death" aggravating circumstance. Appellant argues counsel should have objected to the charge because the term "grave risk of death" is vague and ambiguous and therefore unconstitutional. He argues that without a specific definition of "grave risk," juries will inconsistently apply this aggravator. Appellant's argument is unpersuasive, as this Court has already held the "grave risk of death" aggravator in § 9711(d)(7) is not unconstitutionally vague on its face. [Commonwealth v. *Stevens,* 739 A.2d 507,] 524 (citing *Smith,* at 261). Counsel cannot be found ineffective for failing to raise meritless objections.

*Commonwealth v. Wright*, 961 A.2d 119, 157 (Pa 2008). In *Stevens*, we addressed a shooting scenario, not dissimilar to the instant case. There we held the following instruction given by the trial court provided sufficient guidance and limiting criteria to allow the jury to evaluate the "grave risk" factor.

> A person knowingly creates a grave risk of death to another person in addition to the victim of the offense if he's aware that his conduct is of that nature or that such circumstances exist. Therefore, in deliberating on this aggravating circumstance you should consider all of the evidence concerning the defendant's conduct at the time of the shooting and the attendant circumstances including the number of people in the bar at the time of the shooting, their relative location and proximity with reference to the defendant at the time of the shooting, the number and direction of shots fired, the danger of ricocheted bullets, whether or not the defendant pointed the gun at another person or persons, evidence of the spent bullets in the bar stool, evidence of a hole in the coat of one of the patrons and whether or not that hole was caused by a bullet and evidence of fragments found and their location in the area of the bar.

*Stevens*, 739 A.2d at 524. Instantly, we conclude the trial court's instruction in this case was sufficient and did not fail to limit the consideration of the jury pertaining to what must be proven in order for this aggravating factor to apply. *Id.* As the claim lacks merit, trial counsel cannot be deemed ineffective for failing to litigate the issue. The PCRA court did not err in failing to grant relief on this issue.

## VII.  Issue 5 - Jury Pool Tainted by Pretrial Publicity; Ineffective Assistance of Counsel

### A.  Appellant's Argument

Appellant recounts trial counsel's initial and renewed pretrial motions seeking a change of venue on the basis of prejudicial pretrial publicity, which the trial court denied without prejudice to renew again based on any additional facts developed during *voir dire*. Appellant contends that various responses given by prospective jurors during *voir dire*, and the fact that most of the panel had knowledge of the case through such publicity, provided a basis for renewing the change of venue motion.[29]  Such evidence of taint, Appellant argues, supports a presumption of prejudice.  *Id.* at 130 (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1961)).  Thus, he claims counsel was ineffective for failing to renew his motion for change of venue or otherwise object to the empaneling of a jury panel that was not impartial.

### B.  Commonwealth's Argument

---

[29] Appellant cites the following in support of his assertions.

> During *voir dire*, only 15 of the 99 prospective jurors indicated that they had never heard of the case.  Of the 84 venire members who indicated that they had heard or seen media coverage, 17 indicated that they had either a fixed opinion for death or were leaning that way because of that media coverage.  *See* NT 10/24/06 at 103 (Juror No. 3), 205, 208-209 (Juror No. 10); NT 10/25/06 at 64-65 (Juror No. 15), 102-103 (Juror No. 18), 133 (Juror No. 20), 156 (Juror No. 22); NT 10/26/06 at 8 (Juror No. 26); NT 10/30/06 at 85-86, 108, 110 (Juror No. 44), 218 (Juror No. 51); NT 10/31/06 at 58-59 (Juror No. 59), 92-93 (Juror No. 62), 225-26, 232 (Juror No. 71), 245-247 (Juror No. 72); NT 11/1/06 at 254-256 (Juror No. 83); NT 11/2/06 at 33 (Juror No. 89), 44 (Juror No. 90), 130, 135-36 (Juror No. 97).  One of these individuals, Juror No. 83, was seated as a juror and decided Appellant's sentence. NT 11/1/06 at 282; NT 11/6/06 at 9.

Appellant's Brief at 131.

The Commonwealth notes this Court has held that the existence of pretrial publicity alone does not establish prejudice to a defendant. Rather, the Commonwealth argues the pertinent question "is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial." Commonwealth's Brief at 152 (quoting *Commonwealth v. Briggs*, 12 A.3d 291, 313 (Pa. 2011)). In this case, the prospective jurors were questioned about their knowledge of the case. If they expressed the inability to set aside any preconceived impressions, were unable to decide the case based solely on the presented evidence, or indicated an unwillingness to follow the judge's instructions, they were excused for cause. The Commonwealth argues Appellant has made no showing of prejudice beyond the jurors' familiarity with publicity of the case. A change of venue would not be warranted upon such showing.

## C. Analysis

Our review is guided by the following:

> Ordinarily, an accused challenging a trial court's failure to grant a motion for a change of venue on the basis of pretrial publicity must demonstrate on the record that the publicity at issue caused one or more of the seated jurors to form a fixed opinion prejudicial to her defense. However, [] we have recognized that pretrial publicity may be so inflammatory or inculpatory in nature, and so sustained and pervasive in the community, as to relieve the accused of her burden in this regard, whereupon, regardless of the seated jurors' indications that they could perform their duties fairly and impartially, this Court will presume prejudice and order retrial.
>
> In determining whether pretrial publicity is sufficiently inflammatory or inculpatory as to implicate this presumption, we have consistently looked to whether the publicity's content

is likely to cause readers to become prejudiced against the accused, identifying as particularly suspect publicity which is "sensational, inflammatory, and slanted toward conviction, rather than factual and objective"; "reveal[s] the defendant's prior criminal record, if any [;]" "referred to confessions, admissions or reenactments of the crime by the defendant," or is "derived from official police or prosecutorial reports." In determining whether publicity is sustained and pervasive in the community, we have looked, *inter alia,* to the time between the publicity and trial, the nature and size of the community, opinion polling, and/or the statements of actual venire persons as elicited during the jury selection process. However, we have noted that, even where inflammatory or inculpatory publicity is disseminated in a sustained fashion and pervasively throughout the community, where that publicity is followed by a "cooling off" period sufficient to dissipate its prejudicial effect, a change of venue is unnecessary.

. . .

In reviewing a trial court's determination of whether pretrial publicity requires a change in venue, because the trial court "is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change," we reverse the determination only where it constitutes an abuse of discretion.

*Commonwealth. v. Walter*, 119 A.3d 255, 269-270 (Pa. 2015) (citations omitted)

In Appellant's instant claim, he does not develop any analysis of the pretrial publicity, which he concedes trial counsel submitted to the trial court, to counter the trial court's original assessment that it was not so sensational or pervasive as to result in *per se* prejudice. He rests his claim on specific answers by certain venire-persons relative to their familiarity with, and initial reaction to, that publicity. Again, Appellant presents those answers without any context, and ignoring, as the Commonwealth points out, the answers given by the venire-persons that they could set aside those initial impressions. Appellant does not fault trial counsel's performance of the *voir dire* questioning or his excusing or accepting jurors to serve on the panel. Rather, Appellant baldly claims certain isolated responses provided grounds for per se prejudice and that counsel was ineffective for not renewing his change of venue request.

We conclude Appellant is due no relief. The answers by the venire-persons did not somehow alter the nature and pervasiveness of the publicity already ruled upon by the trial court. Nor did the indications of familiarity with the publicity provide any new grounds to renew the motion where the venire-persons indicated an ability to serve as impartial jurors in this case. *See Briggs*, 12 A.3d at 313. Appellant has not demonstrated his underlying claim has arguable merit or that he was prejudiced by counsel's actions.

## VIII. Issue 6 - Cumulative Prejudice

### A. Appellant's Argument

Finally, Appellant contends that the cumulative prejudice of the violations denied him due process of law. He notes that under *Strickland*, cumulative prejudice may result from multiple constitutional deficiencies even where they do not do so individually. Appellant asserts that the cumulative effect of the preceding deficiencies in counsels' conduct of this case establishes that there is reasonable probability that a different result would have been reached.

### B. Commonwealth's Argument

The Commonwealth notes that only when individual claims have failed on the prejudice prong of the *Strickland* test, as opposed to the arguable merit or strategic reason prongs, does cumulative prejudice become an issue. The Commonwealth reiterates its position that none of Appellant's claims have arguable merit.

### C. Analysis

The Commonwealth is correct that cumulative prejudice is only an issue where denial of PCRA relief is based solely on lack of prejudice relative to individual claims. "[N]o number of failed claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Rainey*, 928 A.2d 215, 245 (Pa. 2007). Given our

disposition of Appellant's individual claims, it follows he is not entitled to relief on this claim.

## IX. Conclusion

In light of the foregoing, we discern no abuse of discretion or error of law by the PCRA court. We conclude that counsel was not ineffective for failing to recognize certain indications of possible FASD or other indicia of intellectual disability that were within the competency and areas of expertise of the experts retained to evaluate Appellant for such issues in mitigation. That those experts opined Appellant was not intellectually disabled despite the alleged "red flags" present does not implicate counsel's stewardship, where counsel placed no restrictions of the evaluations the experts were tasked to perform. We also conclude that absent a showing of counsel's ineffectiveness, the merits of Appellant's *Atkins* claim was not entitled to relief under the PCRA on the bases of revised diagnostic and testing criteria. Similarly, counsel cannot be deemed to have failed to recognize the same "red flags" in the context of his presentation of evidence in mitigation.

Absent ineffectiveness of counsel, we conclude Appellant's Atkins claim was waived and is not reviewable on its merits independently from his ineffectiveness of counsel claim absent an applicable waiver exception. Alternatively, we conclude the PCRA court committed no abuse of discretion or error of law in its factual findings, credibility determinations and conclusion that Appellant failed to meet his burden to prove he was intellectually disabled as to be ineligible for the death penalty.

For the reasons expounded above, we find no merit to Appellant's claims of prosecutorial misconduct, and counsel was not ineffective for failing to litigate them. Finally, Appellant has failed to demonstrate Section 9711(d)'s aggravating factor is unconstitutionally vague as applied in this case, or that the jury was tainted by pretrial

publicity as to preclude a fair hearing or establish *per se* prejudice. As none of Appellant's claims have merit, there is no cumulative prejudice to evaluate.

We affirm the PCRA court's November 21, 2018 order denying post-conviction relief.

Chief Justice Baer and Justice Dougherty join the opinion in full except for Part III(f). Justice Saylor joins Parts I, II, III(G), VI & VII of the opinion.

Justice Saylor files a concurring opinion.

Justice Dougherty files a concurring opinion in which Chief Justice Baer joins.

Justice Wecht files a dissenting opinion in which Justices Todd and Donohue join. Justice Saylor joins Parts II and III of the dissenting opinion.